Argued January 23, reversed and remanded June 13, 1951

## KEEFER *v.* GIVENS

232 P. 2d 808

*Arno H. Denecke,* of Portland, argued the cause for appellant. With him on the brief were Wilbur, Beckett, Oppenheimer, Mautz & Souther, of Portland.

*Randall B. Kester,* of Portland, argued the cause for respondent. With him on the brief were William E. Dougherty and Maguire, Shields, Morrison & Bailey, all of Portland.

Before BRAND, Chief Justice, and ROSSMAN, LUSK, LATOURETTE and WARNER, Justices.

ROSSMAN, J.

This is an appeal by the plaintiff from a judgment in favor of the defendant, which the Circuit Court entered after the plaintiff had presented his evidence and the court had sustained a motion made by the defendant for an involuntary nonsuit. The action was based upon charges that the plaintiff, while riding in the defendant's automobile as a non-paying guest, sustained personal injuries through the reckless and grossly negligent operation of the automobile by the defendant. The motion for the involuntary nonsuit was predicated upon the grounds that the evidence failed to show (1) recklessness; (2) gross negligence; or (3) proximate cause.

The plaintiff's single assignment of error follows:

"The court erred in granting respondent's motion for an involuntary non-suit against the appellant and in entering judgment thereon."

The complaint contains the following specifications of the general charge of recklessness and gross negligence: excessive speed; failure to exercise control; and failure to maintain a lookout.

The misadventure occurred June 7, 1947, at about 1:00 a. m., near the intersection of East 82nd Avenue and Cooper Street in Portland. East 82nd Avenue runs north and south; Cooper Street east and west. Immediately prior to the misadventure the defendant was driving his automobile, a 1935 Ford, south on 82nd Avenue. The plaintiff was seated directly back of him in the rear seat. To the plaintiff's right was one Robert Carrington. To the right of the defendant in the front seat was one E. F. Hill. All four were friends

of each other and were bent upon pleasure. The plaintiff, as well as Carrington and Hill, was a guest of the defendant.

The night was wet and very dark. Witnesses described it as "a black night", "a moist night". The pavement was wet and a light rain or mist was descending. The visibility was poor. The car's only windshield wiper was on the driver's side. According to the witnesses, the windows were "steamed up."

The narrative given by the witnesses began with a friendly call made by the defendant about 8:45 p. m. at the home of the aforementioned E. F. Hill. Shortly the defendant drove Hill to a place called Hi Time Tavern where each drank, what Hill termed, "two beers." Sometime after they entered the tavern they were joined by Carrington, and a little later the three went to a tavern at East 82nd Avenue and Stark Street known as East Is West Tavern, which they reached about 10:00 p. m.

When the defendant's deposition was taken prior to the trial, he testified that while he was at the East Is West Tavern, "we probably had three or four more beers there. Of course, the number of beers may vary, one, two, one way or the other. I didn't pay an awful lot of attention." The parties stipulated that that answer should be deemed a part of the evidence in this case. The defendant's brief, referring to the four men and their activities in the East Is West Tavern, says: "Each of the boys had a few beers." There is nothing, however, in the record which indicates that the plaintiff had any knowledge of the defendant's drinking.

At about 12:30 a. m., the defendant, Hill and Carrington decided to leave the tavern and go to the home

of one of the three men where they would have a bite of food. Outside the tavern they encountered the plaintiff and invited him to join them. He accepted the invitation and the four men entered the defendant's car. We have mentioned the positions which they took in the car.

Upon leaving the tavern the defendant drove south on 82nd Avenue, which is a four-lane thoroughfare. The space between curbs is 56 feet. Evidently the street is level, for no one mentioned a grade. The car proceeded at a rate of between 50 and 60 miles per hour. The plaintiff, in the following sentence, described the manner in which the defendant operated his car: "Quick starts and stops at streets, cutting in and out of what little traffic there was." Other witnesses who engaged in similar comment spoke of the defendant's "Fast changes of gear and quick acceleration." There was little traffic upon the streets except at the intersection of 82nd Avenue and Division Street. Presently they neared the intersection of 82nd Avenue and Cooper Street, that being the scene of the accident. By that time the car had traveled about three miles since the men had entered it upon leaving East Is West Tavern. In that three miles no one had complained about the manner in which the defendant was operating his car.

As the scene of the mishap was approached, Hill, Carrington and the plaintiff, according to their testimony, noticed no car in sight. However, Hill, who, it will be recalled, was seated in the front seat beside the defendant, explained that due to the absence of a windshield wiper in front of him and the steamed-up condition of the glass he could not see through the windshield. When the car was some distance from the

intersection, the defendant asked Hill to reach into the glove compartment, which was in the dashboard directly in front of Hill, and obtain a bottle opener. In order to open the glove compartment it was necessary to press upon a small clasp or lock which formed a part of the compartment door. After Hill had opened the door and had run his hand through the unlighted compartment, he failed to find the bottle opener and closed the door. When he reported that fact to the defendant, the latter said, "Well, I will get it," and, removing his right hand from the steering wheel, leaned to the right, extended his right arm to its full length, opened the door and ran his hand into the compartment. While in that position, the defendant's head, according to Hill, was "about in the center of the car" and no longer back of the steering wheel. We assume that that item of evidence was given because the windshield wiper cleared only the part of the windshield immediately in front of the steering wheel.

Hill described what occurred when the defendant leaned to the right and searched the glove compartment, as follows:

"That's the time that the car, I felt the car go out of control."

We quote further from his examination, as follows:

"Q. You are making a motion like this, like a fish swimming. I take it that you mean that the car was going back and forth?

"A. Yes, the last sensation I had was the rear end of the car going first to one side, then to the other, sliding to the right and then to the left.

"Q. Now, did this action of the car going, the rear end from the right to the left there, did it

start when Mr. Givens [defendant] had his hand in the glove compartment?

"A. Yes, it did.

"Q. You held out your right hand there indicating he was reaching with his right hand for the, for the glove compartment?

"A. Yes.

"Q. You had your arm out all the way?

"A. Yes.

"* * * * *

"Q. What was the position of his head when he was reaching in there?

"A. As he would have to be leaning over to the right — — "

Upon objection, those words were stricken, and thereupon the witness answered as follows:

"A. The last time I saw Mr. Givens just before the accident he was in a position of reaching in over to the right side of the automobile, with his hand inside the glove compartment. I can't say where he was directing his vision. * * * His head was about in the center of the car.

"* * * * *

"Q. Now, can you tell the jury whether or not his head was to the right of the position that a driver's head normally is when he is sitting right behind the wheel?

"A. Yes, it was."

Carrington, whose injuries rendered him unconscious for nine hours, recalled that the speed of the car was "55 or a little better" and also the "quick stops, quick getaways." He also remembered that after Hill had failed to find the object in the glove compartment which the defendant wished, the latter leaned over and ran his hand into the compartment. He added, "It seems like a picture in my mind of

that hand leaning over there, and I knew he shouldn't be leaning over." He was unable to recall anything additional.

The plaintiff described the erratic movement of the car in these words:

"It was a good block, about a block and a half before we hit. We was going terrific, and you could feel the car, it went back and forth, slewed back and forth, back in three times that I remember of. * * * Well, the back end moved back and forth like this, more or less skidding from one side to the other. * * * I remember of three times of skidding, but after that I don't remember. I remember saying one phrase, just, 'Look out, we're going to hit.' "

After the car had escaped from the defendant's control it pursued an erratic movement for a block and a half, in the course of which it veered from the west to the east side of 82nd Avenue where it struck a power pole. The latter stood beyond the curb which marked the east edge of the pavement. When the car came to rest it faced in a northeasterly direction. Photographs taken after the accident, showing the badly damaged car resting against the pole, suggest that the car must have skidded sideways into the pole. According to the photographs, the left front and rear wheels were badly bent under the car, indicating that it slithered sideways with great force. Even a large area of the top of the car on the left was badly stove in.

The evidence was sufficient to denote that the area adjacent to the place where the misfortune occurred was a "residence district" as that term is used in Oregon Laws 1941, Chapter 458, which amends sections of our traffic laws. That statute prescribes twenty-

five miles per hour as the designated speed in such districts.

Section 115-1001, O.C.L.A., provides:

"No person transported by the owner or operator of a motor vehicle as his guest without payment for such transportation shall have a cause of action for damages against such owner or operator for injury, death or loss, in case of accident, unless such accident shall have been intentional on the part of said owner or operator or caused by his gross negligence or intoxication or his reckless disregard of the rights of others."

The statute clearly relieves the host of claims presented by a guest which are founded upon nothing more than ordinary negligence. Therefore, if the evidence above summarized, when given its maximum effect, shows nothing more than ordinary negligence, the attacked judgment cannot be disturbed. *Rauch v. Stecklein,* 142 Or. 286, 20 P. 2d 387.

It is clear that the accident was unintentional. Hence, the clause of the statute which authorizes recovery where the "accident shall have been intentional" must be disregarded. The very fact that the statute makes express provision for the recovery of damages for injuries inflicted intentionally indicates that intention is not an essential ingredient of gross negligence.

Although the record shows that the defendant drank beer in two taverns before he drove his car upon the trip which ended in disaster, the complaint does not allege intoxication and no witness described the defendant as intoxicated. However, even though evidence of intoxication is absent from the record, the testimony showing that the defendant spent the hours immedi-

ately preceding the accident in quaffing beer does not lose its import. A stomach copiously laden with the products of the brewmaster's art is ill adapted to the clear head which every driver should have.

■ We now face the question as to whether or not the facts summarized in the preceding paragraphs, when given their maximum effect, are capable of supporting a finding of gross negligence or of reckless disregard by the defendant of his guests' safety. The question is not whether those facts convince us that the defendant was grossly negligent or exhibited recklessness, but whether or not the motion for an involuntary nonsuit was properly sustained. Since the effect of the evidence was for the jury and not for this court, our sole function is to determine whether the above facts constitute substantial evidence of gross negligence or of recklessness.

■ In determining whether or not the defendant drove his car in a grossly negligent manner or with reckless disregard for the rights of his guests, every act or omission upon his part must be taken into consideration. Since the disaster resulted from the combined effect of the defendant's entire course of conduct, any court, in determining whether or not the defendant's driving was tortious, must not segregate the element of speed, for example, from all the other phases of the defendant's conduct and weigh it alone. Nor should a court select as the object of its analysis the act of the defendant in reaching into the glove compartment and then, isolating that act from all the rest of the evidence, determine whether or not it shows that the defendant drove in a grossly negligent manner. The defendant did not drive, first, at a high rate of speed and then, abandoning that, operate his car upon a wet

pavement in a night which afforded poor visibility and, after abandoning that kind of operation, place himself in an off-balance position which afforded him no view ahead and which enabled him to keep only his left hand upon the steering wheel. Speed, off-balance, lack of lookout, wet pavement, poor visibility, etc., were all phases of a single act of driving. The objective of our analysis must be to determine, not the effect of those factors, one by one, in segregated form, but the combined effect of all of them. See *Turner v. Mc-Cready,* 190 Or. 28, 222 P. 2d 1010. The evidence shows that the defendant was operating his car, which was an old one, (1) at a high rate of speed; (2) with quick starts and stops, weaving in and out of traffic; (3) upon a wet pavement; (4) with steamed-up windows; (5) with a single windshield wiper; (6) under conditions that afforded poor visibility; (7) with his body in an off-balance position whereby he could not see ahead and could keep only his left hand upon the steering wheel; (8) with his attention diverted from driving to a search for a bottle opener; and (9) after several hours spent in taverns amid convivial and bibulous activities.

We think that the evidence warrants a conclusion that the defendant was guilty of ordinary negligence, but, as already indicated, the mere fact that an injured guest produces evidence which can support a finding of simple negligence does not justify the submission of a case such as this to the jury wherein the plaintiff must prove gross negligence. It is necessary, therefore, to go on and determine whether the evidence is capable of supporting a finding of gross negligence.

When the courts hold that proof of simple negligence alone does not suffice to justify the submission

of a case to the jury under guest statutes (see 60 C. J. S., Motor Vehicles, § 399 (4), p. 998, and *Rauch v. Stecklein,* supra), they imply that simple negligence and gross negligence are different. The difference between the two is a matter of degree, tone or aggravation. As we shall presently illustrate by a review of many decisions, simple negligence may arise out of an inadvertent act, but gross negligence is generally accompanied by an attitude of indifference to consequences. The decisions often state that each case must be decided on the circumstances peculiar to it. However, when a number of decisions follow a pattern, it is generally possible, upon analysis, to discover the central principle which govorened the decisions and which was responsible for the pattern.

The opinions in some cases of this kind declare that the host driver was heedless of warnings of danger which had been timely given him, and in other cases rule that the host's driving fell so far below the demands of due care that it was not the result of a mere error in judgment or of momentary inattention, but was, in truth, the manifestation of indifference to consequences. To render clear what we have in mind we shall summarize a few decisions.

We have mentioned the fact that courts, in holding that the evidence was capable of sustaining a finding of gross negligence, occasionally assert that the driver ignored warnings of danger. A case of that kind is *Hartley v. Berg,* 145 Or. 44, 25 P. 2d 932, in which it is said:

"  *  *  *  It is also undisputed that defendant drove past a sign with the word "slow" upon it, which, by looking, he could have seen.  *  *  *

"In the case at bar, the mountain road with a deep canyon to the defendant's left and the high-

way sign of warning given by the word 'slow' proclaimed danger.''

*Layman v. Heard,* 156 Or. 94, 66 P. 2d 492, is another instance in which this court found that the driver's disregard of timely warnings was some evidence of gross negligence. In that case, the defendant, before departing from the home of his father, was given by the latter this admonition: ''Now, Albert, it is going to be icy this morning; you had better be careful how you drive.'' The defendant's guests were his sister and the plaintiff. After the party had traveled about 40 miles, in the course of which patches of ice were encountered, and the defendant had received repeated cautions from his guests, the city of La Grande was reached. There the plaintiff told the defendant: ''For Heaven's sakes, take it easy from here on. Don't try to make Portland on a record drive.'' When the car had gone 3.2 miles beyond La Grande, an icy area was seen and the plaintiff cried out, ''There's ice ahead. Look out!'' The car spun around and hurtled down a steep decline. No difficulty was experienced in holding that the evidence was capable of supporting a finding of gross negligence.

*Milcher v. Adams,* 174 Or. 75, 146 P. 2d 354, was substantially similar in its facts to the above. After the decision had mentioned repeated warnings which the guest had given his host, it declared:

''There was substantial evidence from which the jury could have found that the defendant was operating his car in a grossly negligent manner at the time of the accident: * * * .''

A recent decision to the same effect as those just reviewed is *Weber v. Te Selle,* 191 Or. 85, 228 P. 2d 796.

Another form of warning of impending danger is mentioned in *Smith v. Williams,* 180 Or. 626, 178 P. 2d 710, in which the host-driver, while operating his car at four o'clock in the morning, was besieged by persistent drowsiness. Notwithstanding his condition, he continued the operation of his car and presently, when he succumbed to his somnolence, his car ran off the roadway, inflicting injuries upon his guest. The decision, in holding that the facts were capable of supporting a finding of gross negligence, declared that the defendant "disregarded a danger signal."

An occasional decision rendered in cases brought under the guest statute dwells upon the fact that the guest uttered no protests or warnings. An instance is *Ross v. Hayes,* 176 Or. 225, 157 P. 2d 517.

We have mentioned the fact that many of the decisions find that the host-driver's handling of his car fell so far below the demands of due care that his conduct was deemed a manifestation of indifference to consequences. Courts so holding frequently regard gross negligence as tantamount to the exhibition of an I-don't-care-what-happens attitude. Sometimes they find in the circumstances pertaining to the operation of the car evidence of a conscious indifference to probable consequences. Simple negligence may be found in an inadvertent act, but the fact that courts in gross negligence cases frequently probe the mind of the host in an effort to discover whether he actually was indifferent to consequences, shows thereby that his attitude is important.

An illustration of what we have in mind is afforded by *Younger v Gallagher,* 145 Or. 63, 26 P. 2d 783, which arose out of an unannounced race which the defendant attempted when he drove his light truck alongside an-

other which an acquaintenance was driving upon a public road. The section of the road which is material was 1200 feet long and consisted of a succession of sharp curves. The pavement, 18 feet wide, was damp. The defendant took the inside course with an embankment to his left, which prevented him from seeing approaching cars until they were within 50 or 60 feet of him. His speed was 35 to 40 miles an hour. Presently, after the race had continued for several hundred feet and the defendant was entering a particularly sharp curve, a truck came into view from the opposite direction. In his endeavor to avoid collision with the approaching truck and escape from the one alongside, the defendant lost control of his car, resulting in injury to his guests, of whom the plaintiff was one. The decision, in affirming judgment for the plaintiff, held that the jury was "warranted in finding that the defendant's conduct indicated indifference to the probable consequences of his act."

In *Monner v. Starker,* 147 Or. 118, 31 P. 2d 1109, the accident occurred upon a broad city street at midnight when the defendant lost control of his car while going downgrade at a speed which some estimated as high as 65 miles per hour. The plaintiff was his guest. When the defendant attempted to pass another car he applied his brakes and thereupon his car skidded 147 feet into a curbstone, which it broke, and then veered across the street 108 feet to the opposite side, where it overturned. The defendant had completely lost control of his car. The decision held that those facts were capable of supporting a finding that the defendant's "conduct evidenced a reckless and thoughtless disregard of the lives and safety of the occupants of the car amounting to wilfullness and wantonness upon his part."

It will be observed that in the Younger and Monner cases the court found that the manner in which the cars were operated authorized findings that the driver was indifferent to the demands of safety. In each case the car had been driven in a reckless manner for a considerable distance before the incident occurred which led to disaster. In contrast to those cases, we have *Baird v. Boyer,* 187 Or. 131, 210 P. 2d 118, in which the defendant was driving south upon the Broadway ramp of the Broadway bridge in Portland with the plaintiff as his guest. The ramp is free of intersections after one leaves the Lovejoy ramp and until he reaches Hoyt Street at the south end of the ramp. In that section the defendant accelerated his speed until it was 40 miles per hour according to his belief, and not more than 60 according to the plaintiff's. The speed exceeded the rate fixed by traffic regulations. The ramp is much used and other cars were moving along at the same speed as the defendant's; in other words, he was merely keeping up with traffic. When Hoyt Street was neared a truck was seen coming from the opposite direction, that is, from the south. Presently the truck made a left-hand turn; that is, it turned into the path of the defendant's car. The plaintiff saw no signal given by the truck driver. However, upon noticing that a turn was being made, he called out, "Watch out, you are going to hit that truck." The defendant seemingly saw the truck at the same instant, and replied, "I know it" and "slammed on his brakes", so the plaintiff testified. Before the defendant's car had completely stopped, it struck the rear right part of the truck. It will be observed that although the defendant's speed exceeded the permissible rate, it was no greater than that of other cars

and that the truck which was struck was to the left of the defendant. In sustaining the judgment which the Circuit Court entered for the defendant, notwithstanding a verdict for the plaintiff, this court said:

" * * * One of such definitions of gross negligence, formulated in Rauch v. Stecklein, 142 Or. 286, 20 P. (2d) 387, is as follows:

" ' * * * Thus, gross negligence is conduct which indicates an indifference to the probable consequences of the act. A motor-host who drives in a manner which indicates that he has no concern for consequences and an indifference to the rights of others is said to be guilty of gross negligence. The injury which he inflicts is not entirely inadvertent. His mental qualities, therefore, differ from those of another who is guilty of only ordinary negligence. The condition of mind of the driver who plunges on ahead, grossly negligent of the rights of others, may not be such that we can say that his tortious acts are wilful or wanton, but his mind is at least indifferent to the rights of others or displays those rash qualities exhibited by the foolhardy.' "

Then, referring to the facts before it, which are epitomized in the foregoing paragraph, the decision held:

" * * * It cannot be said that his operation of the automobile indicated a mind 'indifferent to the rights of others', or having 'those rash qualities exhibited by the foolhardy', or having an 'I-don't-care-what-happens' attitude. We think that dedendant's conduct was 'attributable merely to thoughtlessness, inadvertence, or an error of judgment.' Such conduct does not indicate a reckless disregard of the rights of others."

We shall contrast the Younger, Monner and Baird cases a little farther. Obviously, Gallagher's (*Younger*

*v. Gallagher*) loss of the control over his truck after he had provoked a fellow truck operator into a race upon a dangerous, narrow, winding road was not due to inadvertence, thoughtlessness or an error of judgment. It could properly be condemned as the rash act of a foolhardy person and as exhibiting an I-don't-care-what-happens attitude. Starker (*Monner v. Starker*) had no contestant in his midnight race down a broad, straight city street. His was a race against time and for it there was no excuse. In going downgrade he had achieved such a high rate of velocity that his car could not be stopped until it had skidded for well over a hundred feet, had broken the curbstone, veered to the other side of the street and overturned. The observations which we just made about Gallagher are equally applicable to Starker. Boyer, the driver in the Broadway bridge ramp case, was merely maintaining pace with traffic when a truck unexpectedly made a left-hand turn in front of him. Upon that development he did all that was possible to avoid injury to his guest. As the decision pointed out, the collision was inadvertent and manifested no indifference to the safety of others. Boyer's speed, since it was no more than that of the other users of the ramp, could not be deemed culpable, and his action in the emergency displayed no indifference to the demands of safety.

Two more of our decisions show that the manner in which a car is operated may denote indifference to consequences. We shall now summarize them.

In *Turner v. McCready,* 190 Or. 28, 222 P. 2d 1010, one Ralph Ellingsworth was driving an automobile in which a number of his high school companions, including one Charles Turner, were guests. The route lay along a dusty, graveled country road. A short distance

ahead was a friend's car which "kicked up so much dust in the gravel road that they [the defendant] could not see it." Ellingworth's speed was about 50 miles an hour and his car was to the left of the unmarked center line of the road. While it was enveloped in dust, a truck approached from the opposite direction. Due to the dust, Ellingsworth failed to see the approaching truck until it was only 40 feet away. A disastrous collision occurred; both host and guest lost their lives.

It is seen that in the case just reviewed the host was driving on the wrong side of the road and due to dust could not see the car with which he collided until it was too late. In *Cockerham v. Potts,* 143 Or. 80, 20 P. 2d 423, the defendant, while driving upon the left side of a graveled country road, approached the Dayton-McMinnville highway where traffic might be encountered. To the left of the country road was a growth of underbrush which obscured the defendant's view of cars coming from that direction. Without stopping and without glancing to her left, the defendant cut the corner and entered the highway at the very moment when a truck, obscured by the brush, was approaching from the left.

This court held in both the Turner and Cockerham cases that the evidence was capable of supporting findings of gross negligence. A defendant who drives behind another car which envelopes his in a cloud of dust, so that he can see nothing approaching from the opposite direction until it is too late, is similar to a driver who places blinders over his eyes. In the Cockerham, as in the Turner case, the defendant had impaired vision; hers was due to a screen of brush which rendered it impossible for her to see into the highway

which she wished to enter. Notwithstanding the fact that she could not obtain an adequate view into the highway, she cut the corner and, without even endeavoring to look, entered. In both cases, the need for a lookout cried out fervently, and the failure to maintain one was tortious to an aggravated extent. In each case the failure was accompanied with other important items of negligence.

It will be observed that in the cases in which the evidence was held adequate to support a finding of gross negligence, the negligent conduct had continued for a substantial time. For example, in the Younger case, the race had extended for 800 feet; in the Monner case, the car had run for some distance at a high rate of speed; in the Layman case, the automobile had traveled more than 40 miles; in the Turner case, the car, while enshrouded in dust, had gone several hundred feet; in the Cockerham case, the death car had traveled for some time alongside the screen of underbrush which denied its driver a view into the highway; and in the Weber case, the facts of which we have not summarized, the fleeting car traveled at an excessive speed for several miles while a police officer sought unsuccessfully to overtake it.

Upon the other hand, the cases in which no recovery was deemed permissible generally arose out of incidents of the emergency type. For example, in *Rauch v. Stecklein,* supra, the right-hand wheels of the defendant's car got off the pavement into loose gravel, and in the defendant's inept efforts to get back upon the pavement he lost control of the car. In *Baird v. Boyer,* supra, the defendant was confronted with a truck which made an unexpected left-hand turn directly across the course which he intended to pursue. In *Carlson v. Wag-*

*berg,* 183 Or. 95, 190 P. 2d 926, the defendant, while following a truck at nighttime at a speed of 35 miles per hour, undertook to overtake the truck, but in doing so misjudged the distance of a car which was approaching him. In *Rindge v. Holbrook,* 111 Conn. 72, 149 Atl. 231 [cited by defendant], the defendant became distracted by a bee which had entered the car. In *Neyens v. Gehl,* 235 Ia. 115, 15 N.W. 2d 888 [also cited by defendant], the defendant became concerned momentarily with a cigarette which had dropped upon the seat.

██ It is clear that inadvertence, thoughtlessness, brief inattention, error in judgment and momentary loss of presence of mind do not constitute the basis for a finding of gross negligence. The conduct must manifest indifference to the safety of those who entrusted themselves to the defendant's driving. It will be noticed that the indifference is generally revealed by conduct of a continuing kind, as distinguished from something which happened without the volition of the defendant rather quickly.

We shall review our earlier decisions no further. The above summary will suffice for our purposes. Many additional decisions by this court on the subject of gross negligence are summarized in *Turner v. McCready,* supra.

Although we have segregated the decisions reviewed in this opinion into the two classes of (1) timely warning, and (2) indifference by the host to probable consequences, yet all of the decisions actually fall into only one category. The warnings of danger given to a host by a highway marker or by the admonitions of his guest merely bear upon the host's attitude concerning the safety of others. If the manner in which the

host operates his car, whether in disregard of timely warnings or in the face of manifest danger, such as ice upon the pavement, shows that he is indifferent to probable consequences, his conduct may warrant a finding of gross negligence. Accordingly, we say that although we have placed the cases in two categories, they can be merged into one.

In the case now at bar the defendant's handling of his car in the course of the three miles which he traveled after he left the last tavern gained the attention of his guests. It will be recalled that they mentioned his quick starts and stops and the fact that he darted in and out of traffic. His speed was 50 to 60 miles an hour. His action denoted needless haste and could support a finding that he was willing to take chances.

A jury could properly find from the evidence that the defendant was faced with conditions which advised him to be cautious. We have in mind the black night, the wet pavement, the rain or mist which was falling, the steamed-up windows, the age of his car, the poor visibility, the absence of double windshield wipers and the fact that he had spent the night in activities which did not tend to give him a clear head. When the defendant chose to drive ahead upon the wet pavement, in a night which afforded poor visibility, at a speed of 60 miles per hour, with the inside of his windows covered with steam, his conduct was somewhat similar to that in the Turner and Cockerham cases. Possibly the steamed-up condition of the windows and the fact that the defendant's single windshield wiper cleared for him only a small part of the windshield rendered it impossible for him to gain a sufficient view of the surroundings to enable him to regain control of his car after it began to skid.

Although the defendant's car was rushing ahead in the blackness of a rainy night at a very high rate of speed, he chose to take one hand off his steering wheel, project his body to the right and, with the hand which he had released from the steering wheel, conduct a search for an object which he thought was in his glove compartment.

Before making the search, he made no effort to reduce his speed. The evidence descriptive of his act could warrant a finding by the jury, according to our belief, that the defendant could not look through the only part of his windshield which was free from the descending rain while he was searching the glove compartment. Thus, the defendant drove ahead at a high rate of speed, seated in an unnatural position, unable to gain a view ahead and with only one hand upon the steering wheel. The result of his conduct began to manifest itself at once. The uncontrollable manner in which the car skidded about the street for a block and a half until it finally slithered with great force sideways into a power pole across the street could warrant a finding that the defendant's speed was grossly negligent.

Speed, we repeat, was not the only item of negligence imputed by the record to the defendant. We shall not restate once more the many items. A jury could, in our opinion, find that each of the items played its part and that all of them combined to bring about the plaintiff's injury.

In its main features this case is similar to the Monner case. The defendant's driving for approximately three miles was of such a character that it could warrant a finding by the jury that he was displaying the rash qualities exhibited by the foolhardy

and was indifferent to the safety of those whom he had invited to be his guests.

■ The contention of the defendant mentioned in a previous paragraph that the evidence fails to prove proximate cause is largely based upon an answer which the plaintiff made to the effect that he did not know what made the car go out of control. From the plaintiff's position in the car he was unable to observe the search into the glove compartment. We believe that the evidence is capable of warranting a finding that the defendant's negligent operation of his car was the proximate cause of the plaintiff's injury.

We have not mentioned herein all of the numerous authorities cited in the splendid briefs of counsel. All of them, however, have received our attention.

The assignment of error is sustained.

It must be understood that we have not sought to weigh the evidence; our sole purpose has been to detect whether there is any evidence in the record indicating gross negligence. In view of the fact that the cause must be remanded for trial, our analysis of the record should be deemed tentative; that is, confined to the sole purpose of passing upon the motion for an involuntary nonsuit.

The attacked judgment is reversed. The cause is remanded.