Argued January 6, reversed February 17, argued on rehearing
May 19, former opinion adhered to July 27, 1960

# BURGHARDT *v.* OLSON

349 P. 2d 792
354 P. 2d 871

*James O. Goodwin,* Oregon City, argued the cause for appellant. On the brief were Jack, Goodwin & Santos, Oregon City, and Philip A. Levin, Portland.

*George L. Hibbard,* Oregon City, argued the cause for respondent. On the brief were Beattie, Hibbard, Jacobs & Caldwell and Harold Uney, Oregon City.

Before McAllister, Chief Justice, and Rossman, O'Connell and Harris, Justices.

ROSSMAN, J.

This is an appeal by the defendant, Janet Olson, from a judgment which the circuit court entered in favor of the plaintiff Gary Burghardt after a jury had returned its verdict for him. The action is gov-

erned by our automobile guest statute, ORS 30.110 which provides that a non-paying guest in an automobile has no cause of action against his host "unless the accident was intentional on the part of the owner or operator or caused by his gross negligence or intoxication or his reckless disregard of the rights of others." The plaintiff, who was 16 years of age at the time of his injury, appears through a guardian ad litem and charges that the defendant, in operating her automobile in which he was a non-paying guest, was "grossly negligent and acted in reckless disregard of the rights and safety of plaintiff." The defendant was 17 years of age at the time of the mishap, and, like the plaintiff, is represented by a guardian ad litem. The complaint gives the following specifications of its general charge:

1. "Driving at a speed and in a manner that was unreasonable considering the highway, the dark condition, and other conditions then and there existing."

2. "Failed to keep their vehicle under proper control."

3. "Failed to keep a proper lookout."

The accident which underlays this action occurred on the road which leads from Molalla to Woodburn. Some distance prior to the scene of the accident the road makes a curve. The defendant's car, after passing through the curve and some space beyond it, left the road and in that manner the plaintiff sustained his injury.

The defendant-appellant presents only one assignment of error. It predicates error upon rulings which denied defendant's motions for a non-suit and for a directed verdict. Both motions were based upon con-

tentions that the record contained no evidence of gross negligence.

■ We shall now consider the issues presented by the motions just mentioned. Since the verdict was in the plaintiff's favor we will give him the full benefit of all of the evidence. All of it came from witnesses called by him.

At the times material to the issues of this case the plaintiff and the defendant were high school students who lived in or near to Molalla. In the evening of March 14, 1957, the plaintiff, the defendant and some of their fellow students had returned to Molalla from Salem where they had attended a basketball game. Upon reaching Molalla an automobile was placed at the defendant's disposal and she thereupon invited the plaintiff and two other youngsters to accompany her upon a short ride. The plaintiff seated himself to the right of the defendant and the other two youngsters, Willie Olds and Janice Parnell, took the rear seat. A car driven by a friend, Donald Graves, and containing some other high school pupils was about to head for Woodburn and when it started the defendant, upon the plaintiff's suggestion, followed it. After the Graves car had reached a point called Blackman's Corner it paused until the defendant's car came up. Thereupon the plaintiff and Larry Burkholder, an occupant of the Graves car, had a brief conversation. At its conclusion the two cars again resumed their journeys with the Graves car in the lead. The defendant and her friends had nothing in mind as to the trip except to take a ride. According to the plaintiff they engaged in conversation "about the game and this and that."

One mile beyond Blackman's Corner a curve occurs in the road. Immediately beyond it was the scene

of the misfortune which yielded this law suit. The distance between the two places, that is, between the site of the accident and Blackman's Corner, is about one mile.

Since the curve in the road through which the defendant's car had passed shortly before the accident received attention during the trial and is frequently mentioned in the plaintiff's (respondent's) brief, we assume that the plaintiff believes that it had a bearing upon the accident. Generally, a motorist can not drive as rapidly in a curve as upon a straight stretch of road. However, the degree of curvature has a material bearing upon the speed with which he can proceed. A sharp curve obviously presents greater difficulties to a motorist than one of a broad sweeping character. Moreover, the pavement is so sloped or banked in some curves that the operation of cars through the curve is materially facilitated.

The sole evidence upon the subject indicates that the defendant's car did not begin to skid until it had passed through the curve. That evidence was given by one of the plaintiff's witnesses, a member of the Oregon State Police. There is no contention that he misspoke himself or was guilty of an inaccuracy. How far the defendant's car went after it had passed through the curve before it showed signs of distress was left undisclosed. That is, no one mentioned how far the car went upon the straightaway before it escaped from the defendant's control. The road, after it has completed the curve, becomes a straightaway. Although nothing has been called to our attention which tends to indicate that the curve was a factor in causing the accident we will relate the evidence concerning it and also take note of the other evidence pertaining to the other parts of the road.

No witness mentioned the degree of curvature of the turn in the road through which the defendant's car had passed just before the accident. Nor did any witness, in referring to the curve, use a descriptive term such as sharp, blunt, sweeping or right angle. The sole source of information afforded by the record as to the nature of the turn consists of two photographs which were introduced in evidence by the plaintiff and which show the segment of road in which the turn occurs. The two photographs were taken from opposite directions. One of them shows a part of the turn as it would be seen by a person, like the defendant, who approached it going from Molalla. The other shows the approach to the turn as seen by a person going to Molalla. Each photograph was taken at a distance of possibly 300 feet from the turn. Each shows principally the strip of road leading to the turn. The latter was so far from the camera that it is inadequately represented. The road which extends beyond the turn is indicated only by a line of telephone poles that possibly parallels the pavement. The total number of telephone poles that is shown in the distance beyond the turn is four. The poles appear to indicate a straight stretch of road. It is impossible to determine from the photographs the degree of curvature of the turn. It is clear, however, that if the road parallels the poles it takes off at an angle of much less than 90 degrees. In truth, so far as can be judged from the photographs, the angle appears to be substantially less than 45 degrees. However, attempting to ascertain the degree of curvature by looking at the telephone poles as they are represented in the photographs is scarcely anything better than guess work. Further, the photographs do not enable one to determine, except roughly, whether the

turn in the road was abrupt or sweeping. Without knowing whether the turn in the road was sweeping or not it is difficult to decide the rate of speed with which a motorist could essay it. No witness mentioned whether the pavement where the road turns was sloped or banked so as to facilitate the movement of a car through the turn.

ORS 17.250 states that a jury must be instructed by

"* * * the court on all proper occasions:

* * *

"(6) That evidence is to be estimated, not only by its own intrinsic weight, but also according to the evidence which it is in the power of one side to produce and of the other to contradict; and, therefore,

"(7) That if weaker and less satisfactory evidence is offered when it appears that stronger and more satisfactory was within the power of the party, the evidence offered should be viewed with distrust."

If the turn in the road was deemed by the plaintiff to have a material bearing upon this case, we can not understand why something better than these two photographs was not presented as a means of depicting the degree of curvature and the condition of the pavement as to banking at the place where the motorist would make the turn.

The road is hard surfaced to a width of 20 feet. On each side of the pavement a shoulder 4 feet in width, made of gravel, affords more space for the motorist. Beyond the gravel shoulder there lies a drainage ditch four feet deep with sloping, muddy sides. The ditch is about four or six feet broad at its top. Water four or six inches deep is in its bottom. When the defendant approached the turn there was

to her right a post bearing two highway signs. One of them was a representation of a bent arrow and indicated a turn in the road. The other bore the legend "45 M.P.H." The defendant testified that she probably saw these signs.

At the time of the accident the pavement was dry and the weather was clear. The evidence mentions no cars upon the road except the defendant's and Graves'. The defendant's car was in good mechanical condition and her headlights were burning.

The areas to the sides of the road were open, that is, there were no structures or embankments that could conceal a car operating upon it. Both the defendant and the plaintiff were familiar with the road and had been upon it many times. Both were aware of the turns that one encounters between Blackman's Corner and the scene of the accident. The defendant had driven a car over the road several times.

Both the plaintiff and the defendant were rendered unconscious by the injuries which they received in the accident and each was unable to recall the car's passing along the turn in the road. The plaintiff testified that before the car reached the turn he noticed that its speed was 65 miles. He testified that he made no comment concerning that fact, but as the car neared the turn he thought that he mentioned the turn. His words were:

"* * * but it just comes to my memory that I said something about the curve coming up ahead. But I can't remember what happened after that."

The plaintiff had ridden with the defendant previously and thought that she was a careful driver. We take the following from his testimony:

"Q There wasn't anything wrong with her driving as far as you were concerned on this particular

evening except that you thought she was going a little too fast?

"A  Yes, that was all.  Maybe a little too fast.

"Q  Nothing wrong with the car, nothing wrong with the weather or the surface of the highway or—

"A  Not to my knowledge."

Donald Graves, the driver of the car which was a quarter mile ahead of the defendant's, as a witness for the plaintiff, testified that through his rear view mirror he could see the defendant's headlights.  He then gave the following testimony:

"Q  Now, can you tell the jury whether or not she appeared to be gaining on you or just about holding steady or what?

"A  Well, I couldn't say for sure but I was doing about 55, maybe 60, and she was keeping up with me.  She might have been gaining.  I couldn't say.

"Q  You were about a quarter of a mile ahead?

"A  Yes.

"Q  Could you have been going a little faster than that?

"A  55, 60, is what I was going."

Graves successfully passed through the turn in the road and went on.  Presently, one of his friends in his car discerned that something untoward had happened to the defendant's car and thereupon Graves turned back.

James Westerberg, the officer of the Oregon State Police whom we have mentioned, came upon the scene of the disaster a few moments after it had occurred. The defendant's car was then resting upside down on the right hand side of the pavement.  The plaintiff was pinned in the car but the other three occupants were lying unconscious near the ditch.  Westerberg

saw skid marks which began at a place in the roadway after the curve had been completed. They were in the right half of the pavement. He swore "The skid marks were not in the curve." Thus, the skid marks began after the defendant's car had rounded the turn in the road. How far they began from the curve was not disclosed by any witness. They extended across the four foot shoulder of the roadway and then appeared on the other side of the ditch. When the car had reached that point it struck a telephone pole and broke it in two. By the time it struck the telephone pole it had gone 113 feet from the place where the skid marks began. Although the bottom of the telephone pole was not moved—even though it was broken—the top was somehow moved 18 feet. The car's collision with the telephone pole apparently changed the car's course and thereupon it traveled 84 feet more to the right half of the pavement where it came to rest upside down. Its entire course from the place where the skid marks began to the spot where the car came to rest was 197 feet.

The defendant, as a witness called by the plaintiff, testified that she could not recall the incidents of the accident. The following is taken from her testimony:

"Q Do you remember the car starting to skid?

"A No.

"Q You had just about made the curve, had you not, and completed the curve when the car started skidding?

"A All I remember is the car starting to go around the curve."

Photographs of the defendant's car show that its top and sides were badly crushed. The two occupants

of the car's rear seat, Willie Olds and Janice Parnell, were not called as witnesses.

The above is all that the record reveals. It will be noticed that no one mentioned what caused the car to leave the roadway. Likewise, no one indicated the car's speed as it rounded the turn. However, the fact that the car got across the ditch, broke in two the telephone pole and then, upon returning to the pavement, overturned indicates that it had considerable momentum.

■ Since the plaintiff based his case upon charges of recklessness and gross negligence it was incumbent upon him to support those charges with evidence. The specifications of the general charges, as we have seen, are:

1. "Unreasonable speed."
2. "Failure to keep the vehicle under proper control."
3. "Failure to keep a proper lookout."

We are aware of no support for the third phase of the charge, and since the plaintiff's brief calls attention to none we will go on to the other two specifications of the general charge.

The specification that the defendant failed to keep her car under control was undoubtedly true, for surely the defendant did not intentionally take her car upon the erratic course which the evidence discloses. But the issue still remains as to whether the car's escape from the defendant's control was due to gross negligence upon her part.

If the car's escape from the defendant's control was due to her negligence, then the only negligent conduct which the evidence seeks to attribute to the defendant is the rate of speed with which she operated

the car. It will be recalled that no witness was able to state the car's speed as it rounded the curve. The plaintiff expressed the belief that its speed was 65 miles per hour as it neared the highway sign. Other evidence, also produced by him, indicates that the car's speed was 55 or 60 miles per hour.

■■ We will now consider whether the record contains evidence from which a jury could infer negligence. The plaintiff, whose testimony must be weighed in the same manner as that of any other witness, *Kaiser v. States Steamship Company*, 203 Or 91, 276 P2d 410 (1954); *Longview Fibre Co. v. Johnston*, 193 Or 385, 238 P2d 722 (1952); *Tate v. Emery*, 139 Or 214, 9 P2d 136 (1932), testified that the automobile was going 65 miles per hour shortly before the accident and that it neared the curve "going too fast." The defendant, if the plaintiff is believed, had apparently been maintaining this speed from Blackman's Corner. There is authority that under proper circumstances the speed of an automobile at the place of an accident may be proved by evidence of speed at a point close by the scene of the accident. *Pyle v. Wilbert*, 2 Wash 2d 429, 98 P2d 664 (1940); *MacCurdy v. United States*, 143 F Supp 60 (1956) affd 246 F2d 67 (1957), cert den 355 U S 933, 78 S Ct 415, 2 L Ed 2d 416 (1957). *Honeywell v. Turner*, 214 Or 700, 332 P2d 638 (1958), in which the sole testimony as to the speed of a car was that of a witness who estimated it to be "between 40 and 60 miles per hour" and that of the defendant who claimed it was "about 50 miles per hour," held that, taking the evidence in the light most favorable to the plaintiff, the speed could be placed at about 60 miles per hour. Similarly, the jury in the present case could permissibly infer that the defendant's speed at the curve was possibly as high as 65 miles per hour.

The plaintiff's testimony is corroborated to some extent by that of the witness Graves and also by the physical facts surrounding the accident itself. The automobile skidded 113 feet, part of the distance through a muddy ditch, to break a telephone pole off at its base. After this impact the car still had enough impetus to carry it another 84 feet, back to the pavement where it assumed an overturned position. In *Greenslitt v. Three Bros. Baking Co.*, 170 Or 345, 133 P2d 597 (1943), a case not involving the guest passenger statute, this court held that where the driver of a baking truck applied his brakes immediately after striking a man on the highway and came to a halt 124 feet from the point of impact, hurling the body 68 feet, the jury was entitled to infer excessive speed from these facts alone. And in *McVay v. Byars*, 171 Or 449, 138 P2d 210 (1943), a case involving the collision of two cars at an intersection, where the plaintiff charged the driver of the second car with driving at too rapid a speed, we made the following statements:

"* * * There was evidence that defendant's car was 'going forty miles an hour'; and that it was traveling at 'a pretty good speed'. Furthermore, the speed of the car was sought to be deduced from the force of the collision, from the serious character of the injuries which plaintiff and one of defendant's passengers received as a result thereof, and from the effect of the collision upon the cars. As to the latter, at least, we cannot say that it did not tend in some measure to prove the speed at which defendant was driving. Shairer v. Johnson, 128 Or. 409, 412, 272 P. 1027; Goodale v. Hathaway, 149 Or. 237, 244, 39 P. (2d) 678. Whether such speed was excessive or not, under the circumstances, was for the jury to determine."

In addition to all of the foregoing, the indicated speed for the curve, which is revealed by the highway sign, was 45 miles per hour.

The road upon which the defendant was driving at the time of the accident was level and paved to ample width. Although it was night time, nevertheless the atmosphere was clear and the pavement was dry. Only one car was in sight, it being Graves' car. The photographs which we have mentioned show only two houses in the large area which they portray. Both houses appear to stand 100 feet or so back from the road. We have mentioned the fact that the area through which the defendant drove was open country. It was flat, level farm land. The photographs do not show any barns, shrubs, billboards or other obstructions which could conceal from a motorist upon the road a vehicle approaching from some other place. Likewise, they show no intersecting road and no witness mentioned a thoroughfare of that kind.

ORS 483.102 says:

"No person shall drive a vehicle upon a highway at a speed greater than is reasonable and prudent, having due regard to the traffic, surface and width of the highway, the hazard at intersections and any other conditions then existing."

Under that provision, the defendant's act in driving at the rate of 65 miles per hour was unlawful only if it was not "reasonable and prudent, having due regard to the traffic, surface and width of the highway, the hazard at intersections and any other conditions then existing."

■ ORS 483.104 makes provision for designated speeds. None of those enumerated in that section of our laws is applicable to the situation before us except

the following: "fifty-five miles per hour in any other locations." The area in question falls within the category of "other locations." Therefore, the defendant's conduct in driving at the place in question at the rate of more than 55 miles per hour, if in fact she so drove, constituted "prima facie evidence of violation of ORS 483.102." That is, of a speed "greater than is reasonable and prudent." However, her violation of ORS 483.102 would establish nothing more than ordinary negligence.

■ If the defendant was guilty of nothing more than ordinary negligence, the judgment which the circuit court entered in the plaintiff's favor must be reversed because one of the purposes of ORS 30.110, supra, is to relieve the host of liability to his social guest from the consequences of ordinary negligence. He is liable to his guest only if the injury was intentional or was due to recklessness, gross negligence or intoxication. The complaint makes no charge of intoxication or intentional injury. It charges, in addition to gross negligence, recklessness. We do not find in the record any evidence of recklessness as that term is defined in Restatement of the Law, Torts, § 500. However, we shall go on and determine whether or not the record contains evidence which can support a finding of gross negligence.

The term "gross negligence" has defied all efforts to convert it into a formula made up of percentages or other distinct quantities which will enable a judge, or a lawyer, to appraise the driving of a motorist which is under challenge and determine with certainty whether it amounted to gross or only ordinary negligence. However desirable it would be to distill from the large volume of precedents that are in the Reports

a test or other criterion which would have touchstone attributes, seemingly the term "gross negligence" is determined to remain a maverick and repulse all efforts to subject it to the exactness of a formula.

■ But some progress can be made in the direction of certainty if we start with a case in which the evidence submitted by the plaintiff is commonly deemed proof of nothing more than ordinary negligence. For example, evidence that a defendant drove upon a dry, lonely, open, paved, level, country road of ample width at a speed of no more than 65 mles per hour is generally regarded as evidence of nothing more than ordinary negligence, if it is deemed to establish even that much. Accordingly, if the burden of proof rests upon a plaintiff to establish gross negligence, and he has no evidence except that which shows that the defendant drove on a dry, lonely, open, paved, level country road of ample width at a speed of no more than 65 miles per hour, then we have a problem of burden of proof. One of the purposes of ORS 30.110, as we have seen, is to relieve a non-paid host from liability to his guest if the host was guilty of nothing more than ordinary negligence. Therefore, the guest must point to something in the record which shows that it establishes upon the part of the host more than ordinary negligence. It must give an inkling of willfullness, foolhardiness, disregard of warnings, an abandonment to revelry or the adoption of an attitude of "I don't care what happens." If the guest's evidence establishes nothing of that kind and can go no further than to show that his host's driving was of the kind which the courts regarded in the past as nothing more than ordinary negligence, his case must fail for he has not discharged the burden of proof.

This court has held many times that the mere presence in a record of evidence showing that the driver was guilty of ordinary negligence does not warrant a finding in favor of a social guest that the driver operated in a grossly negligent manner. *Burrows v. Nash,* 199 Or 114, 259 P2d 107, made this pertinent ruling:

> "* * * a violation of the basic rules does not, in and of itself, constitute gross negligence * * *."

Shortly it added:

> "* * * Combined with other conditions, a violation of the basic rule may be considered upon the question of gross negligence * * *."

Then the decision engaged in this observation:

> "* * * it certainly would be an unusual case, indeed, where speed, in and of itself, would constitute gross negligence * * *."

*Baird v. Boyer,* 187 Or 131, 210 P2d 118, is an illustration of the application of the rule just stated.

In *Ross v. Hayes,* 176 Or 225, 157 P2d 517, the defendant, as host driver, was driving through what the decision mentioned as an "S curve" at a speed of 40 to 45 miles an hour. The pavement for a space of 100 to 150 feet was covered with frost "making the road surface extremely slippery." At that point the defendant's car skidded and collided with a truck. The plaintiff, as a non-paying guest, sought the recovery of damages on a charge of gross negligence. Our decision, in reversing judgment for the plaintiff, declared:

> "Mere proof that the driver of the automobile was guilty of ordinary negligence in the opera-

tion of the car does not require in all cases the submission to the jury of the question of whether he was guilty of gross negligence.  *  *  *

"In the case at bar there is a total failure of proof of gross negligence on the part of defendant. The manner in which he operated the automobile did not indicate an indifference on his part to the probable consequences of his act or to the rights of others. Nothing connected with his driving resembled 'an I-don't-care-what-happens mental attitude.' "

In *Bobich v. Rogers,* 258 Mich 343, 241 NW 854, the defendant, as host driver, sought to round a turn in the road at a rate of speed which the plaintiff, his non-paying guest, termed excessive. In reversing a judgment for the plaintiff the decision said:

"* * * Conceding that defendant was negligent in making the turn at high speed, it would not constitute wilful and wanton misconduct."

Then the decision mentioned the plaintiff's claim that the defendant's rate of speed violated a Michigan traffic statute, and the court ruled:

"* * * Violation, if any, of that statute does not constitute the gross negligence or wanton and wilful misconduct requisite to maintenance of an action under the guest act."

■ We see from the decisions of which we just took note that even if the unfortunate accident took place in the curve, the evidence presented by the plaintiff does not suffice to warrant a finding of gross negligence. If it could be assumed that the car left the pavement immediately after it had rounded the turn, and that its escape from the defendant's control at that point was due to the lurch, sway or centrifugal force which was imparted to it in rounding the curve,

yet in such an event the defendant's failure to have mastered the situation was momentary only and would fall within the rule employed by cases such as *Gantenbein v. Huckelberry,* 211 Or 605, 315 P2d 792. Her fault, if any, would not amount to gross negligence.

The record contains nothing which indicates that the defendant was not attentive to her duties as the operator of the car, nor does it intimate that she was not duly solicitous of the safety of her guests. No one contends that she took her hands off the steering wheel, her eyes off the road or transferred her attention to the conversation. The plaintiff sat along side her and since he watched, at least at times, the speedometer and likewise noticed the highway sign as the car neared it, it is safe to infer that if the defendant had relaxed in her duties to the operation of the car he would have noticed it. There is nothing in the record of the kind mentioned in *Keefer v. Givens,* 191 Or 611, 232 P2d 808, and *Turner v. McCready,* 190 Or 28, 222 P2d 1010; *Reese v. Bridgmon,* 217 Or 290, 340 P2d 573; and *Gonzalez v. Curtis,* 217 Or 561, 339 P2d 713, concerning warnings given and ignored or the adoption of an "I-don't-care-what-happens attitude" which could transmute the defendant's ordinary negligence, if any, into gross negligence. The fact that the evidence does not disclose with any degree of precision the curvature at the turn renders it difficult to appraise fairly the defendant's driving.

As we said before, the plaintiff presented evidence from which the jury could have found, and probably did, that the defendant's speed was negligent, but, in our opinion, he presented no evidence from which anything more than that could have been inferred. That is, he did not present evidence from which the

jury could have found that the turn in the road was so sharp and the defendant's speed was so rapid that a juror could say that only the foolhardy and those who gave no heed to the safety of their guests would have attempted the turn in that manner. In other words, we do not find in the record evidence which could warrant a finding of gross negligence.

The assignment of error is sustained. The challenged judgment is reversed.

O'CONNELL, J., specially concurring.

It is evident from our cases, including the more recent ones, that our interpretation of the guest statute, ORS 30.110, has not been entirely consistent. Note: 33 Or L Rev 216 (1954). Perhaps any further effort to clarify the matter will simply lead to further confusion, but the need for a consistent application of the statute is so great that I venture to express my views in the hope that they might suggest a solution.

To establish a stable position in the treatment of cases under the guest statute we must reach some measure of agreement as to the standard of conduct which we conceive the statute to describe by the language "gross negligence" and "reckless disregard of the rights of others." One would be naive to assume that anything more than a rough guide could be devised by which to test the facts in the host-guest cases. But if we cut a crude pattern only, and follow it, the lawyers and the trial judges would at least have something to guide them in dealing with this type of case.

I think that a part of the solution will be found in a clearer statement of the problem which confronts us in the application of the guest statute. Our statute,

like the guest statutes in most states, is phrased in terms of categories of fault. It speaks in the language of degrees of negligence, i.e., "gross negligence" which, according to the classification from which it is borrowed, is a category of negligence greater than ordinary negligence. It also speaks of "reckless" conduct which is sometimes regarded as a part of the negligence classification and sometimes as a separate type of fault. See *State v. Wilcox,* 216 Or 110, 337 P2d 797 (1959). It is now pretty nearly universally recognized in respectable legal circles that one cannot divide negligence into degrees. Negligence is negligence, whether the conduct involves the failure to exercise great or slight care, or any gradation in between, if, under the circumstances there is a duty to the plaintiff. Brown, The Law of Personal Property (2d ed) p 327; 2 Harper and James, The Law of Torts, § 16.13; Prosser on Torts (2d ed), p 147; Salmond on the Law of Torts (11th ed), p 511. It is proper, of course, to postulate principles of liability upon the basis of the amount of care which, as a matter of policy, should be exercised in various circumstances. This is the underlying theory implied in the guest statute.

If the statute were applied in accordance with its language, we would be expected to draw a line in each case between ordinary and gross negligence. Since, as pointed out above, there is no such thing as gross negligence, the court cannot make the distinction suggested and the best that it can do is to translate gross negligence to mean "great negligence" as Mr. Justice LUSK did in *Rogers, Administrator v. Southern Pac. Co.,* 190 Or 643, 227 P2d 979 (1951), and attempt to find some practical criterion which

will permit us to draw a line on the scale of fault where we think that it will carry out the purpose or purposes of the guest statute. This is what we have tried to do in our previous guest cases. Finding it impossible to make distinctions on the scale of fault at the lower level, we looked higher on the scale for a more aggravated type of fault which, by leaving a wide chasm between it and "ordinary" fault, could be more readily differentiated in applying the guest statute. Thus, it is seen that the elimination of the less serious instances of aggravated fault intended to be included in the term "gross negligence," resulted not simply from an effort to state the legislative policy of the guest statute, but from the necessity of finding a workable test of fault. The widest gulf and the clearest distinction could have been established by requiring the guest to prove that his host intentionally injured him. *Taylor v. Taug,* 17 Wash2d 533, 136 P2d 176 (1943); *Parker v. Taylor,* 196 Wash 22, 81 P2d 806 (1938); *Carufel v. Davis,* 188 Wash 156, 61 P2d 1005 (1936); *Shea v. Olson,* 185 Wash 143, 53 P2d 615, 111 ALR 998, affirmed 186 Wash 700, 59 P2d 1183, 111 ALR 998 (1936).

Next lower on the scale is an area of fault which has gone by various legal names ("wilful," "wanton," "reckless") and which can be generally characterized by the actor's consciousness of risk. This area is sometimes described as negligence and sometimes as something distinct from negligence. *State v. Wilcox,* supra; Prosser on Torts (2d ed), p 150; 2 Harper and James, The Law of Torts, § 16.15. The feature which is thought to distinguish it from "ordinary" negligence is the actor's state of mind. 2 Restatement, Torts, § 500, comment g; Elliott, Degrees of Negligence, 6

So Cal L Rev 91, 143 (1933). Here again language can be fashioned to describe gradations of fault within this area itself. The most blameworthy conduct would be that involved in a situation in which the driver-host, having *actual knowledge* of a *high probability* of *serious harm* to his guest, *intentionally* elects to expose the guest to the unreasonable risk. For convenience we might describe this conduct as reckless conduct Type I. It is frequently described as "wilful" conduct, or "wanton" conduct, or as "wilful and wanton" conduct. 2 Restatement, Torts, § 500 describes it as "reckless" conduct. See Note: Distinguishing Wilful Misconduct, Wanton Misconduct, and Negligence, 18 U Cinc L Rev 319 (1949); Note: Appleman, Wilful and Wanton Conduct in Automobile Guest Cases, 13 Ind L J 131 (1937). According to some adjudicated cases the language is strong enough to indicate that this is the character of the driver's fault which must be established by the guest. *Clarke v. Storchak,* 384 Ill 564, 52 NE2d 229, 322 US 713, 64 S C 1270, 88 LE 1555 (1944). See: *Tighe v. Diamond,* 149 Ohio St 520, 80 NE2d 122, 82 NE2d 99 (1948); *Granflaten v. Rohde,* 66 S D 335, 283 NW 153 (1938). In some states, it would seem, this standard of conduct is set as the minimum for recovery by the requirement that the guest must prove that the driver engaged in a continued and persistent course of action, sometimes referred to as the "persistent course of action test." Note: 37 Tex L Rev 358 (1958). It should be noted that if the driver did not have knowledge of the risk the test for reckless conduct Type I is not met by showing that there were facts known to the driver from which he *should realize* the danger to his guest. The latter type of conduct may be referred to as reckless conduct Type II. It applies an objec-

tive test of fault and is easier for the guest to establish than the subjective test for reckless conduct Type I.

If Type I conduct is the test of fault, the guest would have to produce evidence to show that he warned the driver of the danger, or that the driver had actual knowledge from some other source that danger was being encountered. Perhaps no jurisdiction consistently adheres to such a test, and probably all courts recognize that the requisite consciousness of risk "may be inferred from manifestly dangerous conduct." 2 Harper and James, The Law of Torts, § 16.15, p. 955, note call 27. *Turner v. McCready,* 190 Or 28, 222 P2d 1010 (1950) clearly states that the inference may be drawn. Mr. Justice BRAND said, "The element of recklessness may, under some circumstances, be inferred from evidence of the driver's conduct in the light of conditions and of what he must have known." 190 Or 28, 54.

It is likely that a part of the confusion in the guest cases arises out of the fact that the distinction between the two types of reckless conduct described above is not kept in mind. And even if the distinction is seen, a variation in the application of the objective test described in reckless conduct Type II will result if the court changes its attitude from time to time as to the amount of evidence necessary to draw the inference that the driver had reason to know of facts which would lead a reasonable man to realize the danger. It is possible that this has caused some of the variation in the application of our own guest statute.

It has become common practice to express the test of fault in this state in terms of an "I don't

care attitude" on the part of the driver. This phrase has the virtue of expressing a legal idea in language which can be understood by the jury. But I believe that its generality encourges "passing judgment in bulk" (Green, Judge and Jury, p 156) and, moreover, its emphasis on the idea of the *consciousness* of the risk has led us to overlook on occasions the other elements of the test which are equally, if not more, important.

The full consciousness that a risk is to be encountered will not result in reckless conduct if the probability of harm is slight, or if the probability is great but the harm which will probably result is not serious. This can be illustrated by reference to the facts in the present case.

There is no difficulty in finding that defendant was conscious of a risk when she approached the curve. From her previous use of the particular highway she knew that the curve was there, its character and the speed indicated by the highway sign as the safe speed to negotiate the curve. The ingredient which is lacking is the *high degree of probability* that serious harm would result. It is common knowledge that curves are frequently negotiated safely at speeds which exceed the indicated speed posted by the highway department. We are entitled to recognize that rounding a curve at a speed twenty miles in excess of the indicated speed of 45 miles per hour does not, in itself, show that there is involved a high probability of serious harm. Stated in another way, upon the basis of such facts alone there is not a sufficient warning of danger to characterize the conduct as reckless.

Had it been shown in this case that the curve was sharp, or that there were defects in the highway, or

construction equipment in the road, or other circumstances known to the defendant which would increase the risk of harm, the case in all probability would present sufficient facts to warrant submitting it to the jury. There were no such facts here.

I believe that the variations in our treatment of the guest statute in previous cases can be attributed in large measure to the use of general language in the test for fault (such as expressing the test in the formula of an "I don't care attitude") which suggests clearly enough the idea that the defendant must be conscious of the risk but conveys little more than that, and de-emphasizes and perhaps sometimes even results in eliminating the other ingredients in the test for reckless conduct. I think that we would establish and maintain a reasonably consistent position in the guest cases if we would subject each case to a test which recites all of the elements of reckless conduct as we understand that term. I would accept as the test the definition set out in 2 Restatement, Torts, § 500 at p 1293. That section reads:

> "The actor's conduct is in reckless disregard of the safety of another if he intentionally does an act or fails to do an act which it is his duty to the other to do, knowing or having reason to know of facts which would lead a reasonable man to realize that the actor's conduct not only creates an unreasonable risk of bodily harm to the other but also involves a high degree of probability that substantial harm will result to him."

This section has been adopted in some states in applying their guest statute. *DeLoss v. Lewis,* 78 Cal App2d 223, 177 P2d 589 (1947); *Espeland v. Green,* 74 S D 484, 54 NW2d 465 (1952)

The adoption of the Restatement definition is not likely to give us any significantly better guidance in dealing with the guest cases unless we are careful in each case to apply the definition *with reference to each of the elements it contains*. As the comment appended to 2 Restatment, Torts, § 500 explains, we are testing for conduct which involves " a high degree of chance that serious harm will result from it to anyone who is within range of its effect"; it must involve "an easily perceptible danger"; the danger perceived must be a danger of "substantial bodily harm or death"; the circumstances must be such that "the risk so created is unreasonable"; the driver must act or fail to act "knowing or having reason to know" of facts which would lead a reasonable man to realize "the highly dangerous character of his conduct."

Further, I believe that we need to guard against losing sight of the purpose for which we are seeking a definition of fault. The definition we accept is not an end in itself; it is a part of the process of interpreting the guest statute. The question of the amount of care that must be exercised, or the degree of fault which must be found to impose liability under the guest statute cannot be decided abstractly. It must be related in some way to the purpose for which the guest statute was enacted. Without the guest statute the host driver would be liable to his guest for injuries arising out of ordinary negligence. The legislature decided that a different policy is applicable when an automobile guest sues his host.

It is generally recognized that this type of statute was intended to "scotch 'the proverbial ingratitude of the dog that bites the hand that feeds him' and to put a barrier in the way of vexatious litigation." 2

Harper and James, The Law of Torts, p 961. The statute leaves to the judicial system the task of administering this policy as each case is presented and the decision as to whether particular conduct is or is not reckless must be made with reference to that policy. It is possible that a part of the lack of cohesion in the guest cases results from the failure to anchor the definitions of gross negligence, reckless conduct and similar terms to the statutory purpose and in the failure to judge the driver's case with this legislative policy as a guide.

Whatever test we apply, there will always be the problem of keeping our function distinct from that of the jury. Our sole task is to determine whether there are sufficient facts in the particular case before us from which the jury can reasonably find that the accident was caused by defendant's reckless conduct. The temptation here is to leave to the jury the difficult task of drawing a line between ordinary misconduct and reckless conduct. See *Rinkevich v. Coeling,* 344 Mich 493, 74 NW2d 12 (1955), noted in 34 U Det L J 169 (1956). But we are charged with the duty of interpreting the guest statute and of establishing what we conceive to be the minimum amount of fault which can still characterize the conduct as reckless within the meaning of the statute. In setting that minimum we must not read into the statute our own view of the policy which should govern host-guest litigation or automobile litigation generally; we must attempt to find the legislative objectives which prompted the legislation. No sharply defined legislative policy can be discerned, but the strong language of fault in the statute and our understanding of the setting in which host-guest legislation was drafted gives us a fair

intuition with which to work.  But cf., Burrell, A New Approach to the Problem of Wilful and Wanton Misconduct, 1949 Ins Law J 716.

With the shift in ideas of the basis for liability from fault to compensation which seems to be prevalent, not only in the jury room but in respectable legal circles as well, the application of the statute in the terms of its original purpose serves to accentuate the difference in treatment between the automobile guest and others in the adjudication of their respective claims.  Green, Traffic Victims, Tort Law and Insurance, *passim*; 2 Harper and James, The Law of Torts, *passim*; Note: 35 Dicta 179 (1958).  Perhaps the time has come when the jury should be permitted to treat automobile guests in the same manner as it treats other injured plaintiffs; but that change must come from the legislature, not from us.

In my opinion there was not sufficient evidence in the present case from which the jury could justifiably conclude that defendant's conduct was reckless within the meaning of ORS 30.110.  Therefore, I concur.

HARRIS, J. (Pro Tempore), dissenting.

The constitution of this state demands that "No fact tried by a jury shall be otherwise re-examined in any court of this state, unless the court can affirmatively say there is no evidence to support the verdict." Oregon Constitution, Art 7, § 3 (1910).

In commenting on this provision of the constitution, this court stated in *Hamilton v. Kelsey*, 126 Or 26, 30, 268 P 750, as follows:

"* * * In proceeding with our investigation we must bear in mind that we are not authorized to weigh and appraise the value of the evidence.

The Constitution of this state has limited our powers to that of detecting its presence."

This court in *Farrin v. State Industrial Acc. Com.*, 104 Or 452, 466, 205 P 984, approved the following statement taken from 1 Moore on Facts, § 20:

"Judge Cooley * * * said: 'The jurors, and they alone, are to judge of the facts and weigh the evidence. The law has established this tribunal because it is believed that, from its numbers, the mode of their selection, and the fact that the jurors come from all classes of society, they are better calculated to judge of motives, weigh probabilities and take what may be called a common-sense view of a set of circumstances involving both act and intent than any single man, however pure, wise, and eminent he may be.' *People v. Garbutt,* 17 Mich. 9; Moore on Facts.

" 'The jury, from their experience and knowledge of the common concerns of life, are presumed to be the best triers of fact,' said Judge Scott of the Missouri Supreme Court. 'They take with them into the jury-box their experience in life, which has enabled them to form the rules by which they will ascertain the weight to be given to the evidence of anyone who speaks in their sight and hearing, having due consideration of the circumstances by which he is surrounded.' *State v. Schoenwald,* 31 Mo. 147, 155.

" 'Without discussing the relative merits of a fixed tribunal for the trial of facts, and the trial by jury,' said Judge Pearson of the North Carolina Supreme Court, 'suffice it that the common law prefers the latter, and considers it safer, in the investigation of facts, to depend upon the good sense of a jury, than upon the knowledge of a judge; for the reason that juries take a common-sense view of every question, according to its peculiar circumstances, whereas a judge generalizes and reduces everything to an artificial system

formed by study.' *State v. Williams,* 2 Jones L. (47 N.C.) 257, 269.

"Mr. Justice Miller said: 'In my experience in the conference room of the Supreme Court of the United States, which consists of nine judges, I have been surprised to find how readily those judges come to an agreement upon questions of law, and how often they disagree in regard to questions of fact, which apparently are as clear as the law.' 1 Moore on Facts, § 19."

Only the evidence favorable to plaintiff and the inferences favorable to plaintiff deducible therefrom are to be considered on a motion to remove a case from the consideration of a jury.

" 'The rule is that if two inferences may be legitimately drawn from the facts in evidence, one favorable and the other unfavorable to the defendant, a question is presented which calls for the opinion of the jury.' *Galvin v. Brown & McCabe,* 53 Or. 598 (101 Pac. 671)." *Farrin v. State Industrial Acc. Com.,* supra, at p 464.

The sole legal issue presented to this court is not its appraisal as to whether or not defendant was guilty of gross negligence as that term has been defined in prior decisions of this court (apparently to the satisfaction of the legislature, which has not altered the guest statute), but whether the evidence presented is such that reasonable men could differ concerning the conclusion to be drawn from it with reference to the issue of gross negligence.

Mr. Justice RAND, speaking for this court in *Storm v. Thompson,* 155 Or 686, 694-695, 64 P2d 1309, in a case not too dissimilar from the instant case, said:

"We cannot say from the facts above stated that all reasonable minds would draw the same

conclusion that the defendant was negligent or not negligent, and, if negligent, whether the same amounted to gross negligence. Hence, those questions were not questions of law for the court but were questions of fact for the jury. When the facts are such that reasonable minds will differ as to whether there was negligence, the determination of the matter is for the jury and it is only where the inference to be drawn from the facts is so plain that all reasonable minds will draw the same conclusion that it becomes a question of law for the court."

The same rule is laid down by the Restatement.

"The extent of the court's control varies in the different jurisdictions of the United States, but in general goes no further than to permit the court to withdraw a question from the jury when, in the court's opinion, the evidence presented is such that reasonable men could not differ as to the conclusion to be drawn from it." 3 Restatement 438, Torts, Comment on Subsection (2).

The plaintiff is entitled to rely on circumstantial as well as direct evidence. Thus Justice WOLVERTON, speaking for the court in *Nat. Bank v. Fire Association*, 33 Or 172, 187, 53 P 8, 50 P 568, stated:

"* * * That there was no direct evidence of the explicit fact of firing the goods, implicating the proprietors, none can gainsay; but the question here is whether there was any evidence, direct or circumstantial, sufficient to go to the jury, from which they could fairly infer the fact at issue. If so, the question was for the jury, and the court could not invade its province by directing them to bring in a certain kind of verdict."

The writer accepts the majority's statement relative to the issue of speed in this case as follows:

"* * * Similarly, the jury in the present

case could permissibly infer that the defendant's speed at the curve was possible as high as 65 miles per hour."

Indicating that defendant had full knowledge of the highway in question, the curve and its character, and the 45 mile per hour speed sign which designated the safe speed to negotiate the curve, is the following statement taken from the concurring opinion:

"There is no difficulty in finding that defendant was conscious of a risk when she approached the curve. From her previous use of the particular highway she knew that the curve was there, its character and the speed indicated by the highway sign as the safe speed to negotiate the curve."

Both the prevailing and concurring opinions seem to question whether the curve was a sharp one. Also the prevailing opinion seems to question whether the curve was a causative factor in the accident. Therefore, the writer herewith annexes exhibits 4 and 3. Exhibit 4 portrays the curve in the direction defendant's car was traveling; exhibit 3 portrays the curve from the opposite direction. From these photographs it is submitted the jury could find that the curve was a sharp one—at least a 45 degree curve. The Texas Supreme Court characterizes a 30 to 45 degree curve as follows: "—that the curve was a rather sharp one of from 30 to 45 degrees." *Burt v. Lochausen,* 151 Tex 289, 299, 249 SW2d 194. Moreover, the defendant herself concedes and characterizes the curve as a sharp curve. Thus she states in her brief: "The accident occurred just beyond a sharp curve which is shown in Exhibits 3 and 4." It is submitted the defendant should be familiar with the curve. Likewise it is reasonable to assume defendant would

not make an admission in her brief that was not justified by the record.

With reference to the causal connection between the curve and the accident, it must be remembered that the pavement was dry, and that the car started to skid at least 113 feet east of the pole marked on exhibit 3. Again defendant states in her brief as follows:

> "The physical evidence observed by the police officer is indicated on Exhibit 5. Skid marks 113 feet long began just past the curve and ran to a telephone pole off the highway, which was broken in two."

Viewing the evidence in the light of the cardinal principles reviewed in earlier paragraphs, it is submitted the jury could reasonably find that the curve was definitely a causative factor in the accident. How can it be held as a matter of law that the curve was not a factor when it is remembered that the defendant entered it at a rate of speed of 65 miles an hour at nighttime? The fact that the skid marks started "just past the curve" indicates no effort was made to brake the car until it became out of control "just past the curve."

The majority opinion states:

> "* * * A sharp curve obviously presents greater difficulties to a motorist than one of a broad sweeping character. Moreover, the pavement is so sloped or banked in some curves that the operation of cars through the curve is materially facilitated."

It is submitted that the matter of sloping or banking, if any, of the pavement is sufficiently portrayed by exhibits 3 and 4 so that the jury could make an

appraisal thereof. The prevailing opinion comments on the adequacy of the photographs, exhibits 3 and 4. The defendant herself testified that these exhibts were true and correct representations of the curve. No contention was raised below or here by defendant to the contrary.

The State Highway Department placed warning signs at the entrances to this curve, drawing attention to it and designating a speed of 45 miles per hour. The defendant admitted that she was well acquainted with the curve and that she realized that she was approaching it. It is submitted that a speed of nearly 50 per cent in excess of the designated speed by a 17-year-old girl at nighttime in negotiating this curve upon a highway such as indicated by the evidence could be found to be gross negligence by a jury. Would all reasonable minds arrive at a contrary conclusion?

It will be remembered the highway department had erected a sign designating the speed for negotiating this curve at 45 miles per hour. ORS 483.106 provides for the designation of speeds upon the basis of an engineering and traffic investigation, and that only after an investigation and determination that any speed is greater than is reasonably safe under the conditions found to exist upon any state highway should such speed be designated. The presumption is that the state highway officials faithfully performed their functions.

The prevailing opinion states as follows:

"ORS 17.250 states that a jury must be instructed by

" '* * * the court on all proper occasions:
* * *

" '(6) That evidence is to be estimated, not only by its own intrinsic weight, but also according to the evidence which it is in the power of one side to produce and of the other to contradict; and, therefore,

" '(7) That if weaker and less satisfactory evidence is offered when it appears that stronger and more satisfactory was within the power of the party, the evidence offered should be viewed with distrust.'

If the turn in the road was deemed by the plaintiff to have a material bearing upon this case, we can not understand why something better than these two photographs was not presented as a means of depicting the degree of curvature and the condition of the pavement as to banking at the place where the motorist would make the turn."

The writer was always of the opinion that the foregoing statutory rules applied only to situations in which the evidence was exclusively in the possession of one party. *Frangos v. Edmunds,* 179 Or 577, 595-596, 173 P2d 596; *Fitze v. American-Hawaiian SS. Co.,* 167 Or 439, 444-450, 117 P2d 825. However, if the statutory rules cited are to apply, it may be noted that while the plaintiff made the showing he did with reference to the road and the curve, counsel for defendant directed no questions to the defendant relative to the roadway, the curve, the accident, her keeping up with the car ahead, or her speed in the mile preceding the curve. Also, the defendant rested without the introduction of any evidence.

The concurring opinion states:

"Had it been shown in this case that the curve was sharp, or that there were defects in the highway, or construction equipment in the road, or other circumstances known to the defendant which would

increase the risk of harm, the case in all probability would present sufficient facts to warrant submitting it to the jury. There were no such facts here."

It is submitted that the record, characterized by the concessions of the defendant, indicates that the curve was a sharp one, and that the jury could find that a high degree of probability existed that serious harm would result from the operation of a car at 65 miles per hour into this curve at nighttime.

The prevailing opinion relies upon the case of *Ross v. Hayes,* 176 Or 225, 157 P2d 517, and the Michigan case of *Bobich v. Rogers,* 258 Mich 343, 241 NW 854. In *Ross v. Hayes* the opinion points out that the accident happened:

"* * * As they were passing through an S curve, near Algoma, the Dodge suddenly swerved clock-wise across the highway and skidded sideways 75 or more feet."

The court also points out in *Ross v. Hayes* as follows:

"Where the accident occurred the entire twenty-foot width of the oiled macadam pavement for a distance of 100 to 150 feet was covered with frost, making the road surface extremely slippery. The frost on the highway 'doesn't show any particular color; just looks clear.' At times it can be seen depending somewhat on the direction in which one is looking. 'Lots of times you can't see it until you are right on top of it.' Defendant Ault testified that he did not have any trouble in seeing the ice at the place of the accident, but he did not say where he was when he first saw it. Neither defendant Hayes nor any of the passengers in the Dodge car noticed the frost or ice on the pavement before the car started to skid.

"* * * * *

"The S curve above referred to was described as 'not a very steep curve at all. I wouldn't say it was a steep curve, just a modest curve.' Plaintiff estimated that defendant Hayes was driving from 40 to 45 miles an hour when he 'went into this curve.' "

It thus appears that the curve involved in Ross was not a very steep curve, and that the driver was going from 40 to 45 miles per hour when he entered the curve; also, that the ice or frost in question was not noticed by the driver before the car started to skid. This, of course, differentiates the Ross case from the instant case where the driver was fully cognizant of the condition of the road and the curve, of the warning sign, and where her speed was far in excess of that of the driver in the Ross case.

The Michigan case of *Bobich v. Rogers,* supra, is inopposite for two reasons. In Michigan, as is pointed out in the opinion, willful and wanton misconduct must be proved before there can be a recovery. Likewise, the only evidence with reference to speed in Bobich was that the defendant was driving in excess of 20 miles per hour.

It is submitted that the Oregon case which is closest to the facts of the instant cause is *Storm v. Thompson,* supra. The Storm case was an action to recover for an injury sustained by plaintiff while riding as a passenger in defendant's automobile. At the time the car was being driven by defendant's brother-in-law, who was not familiar with the road. The opinion stated the road made a turn at nearly a right angle, but the car at the time of the accident was going only 40 or 45 miles per hour. Although the defendant himself was not behind the wheel the court held that the question of his gross negligence

was properly submitted to the jury, and in doing so stated as follows:

"The evidence in the instant case shows that the driver of the automobile was a competent and experienced driver but that he was not familiar with the road or with its turns, and this fact was known to the defendant, who was himself familiar with the road and knew the danger of passing or attempting to pass the turn where the accident occurred at a high rate of speed. The night of the accident was very dark but the roadway was dry, and the accident would not have happened had the automobile been driven at a less rate of speed. There were no warning signs in the vicinity of the turn and, before reaching it, the car had passed over a straight roadway for a considerable distance and was being driven, according to defendant's testimony, at some 40 or 45 miles an hour.

"The evidence further shows that the defendant was engaged in conversation with plaintiff and her husband and at times had his head turned in their direction. Apparently he was paying no attention to the road or to the location of the car. Just before reaching the turn and about 100 feet therefrom there was a house with which the defendant was familiar and he knew that within a very short distance therefrom there was a sharp turn which the car would have to pass. Upon seeing the house, he warned the driver that he was driving too fast but this warning came too late to enable the driver to check the speed of the car so as to make the turn in the road and, for that reason, the car was driven off the highway where the accident to plaintiff happened.

"We cannot say from the facts above stated that all reasonable minds would draw the same conclusion that the defendant was negligent or not negligent, and, if negligent, whether the same amounted to gross negligence. Hence, those questions were not questions of law for the court but were questions of fact for the jury. When the facts

are such that reasonable minds will differ as to whether there was negligence, the determination of the matter is for the jury and it is only where the inference to be drawn from the facts is so plain that all reasonable minds will draw the same conclusion that it becomes a question of law for the court."

While each gross negligence case must be judged upon its own facts, and no two are exactly similar, it is submitted that the decided weight of authority from outside jurisdictions supports the proposition that under facts bearing a similarity to those involved in the instant cause, the question of defendant's gross negligence is considered one of fact for the determination of the jury. Thus in *Nangle v. Northern Pac. Ry. Co.*, 96 Mont 512, 32 P2d 11, 14, we find the following statement:

"In many cases, under statutes permitting recovery on behalf of the guest as against the driver of an automobile for gross negligence—where the driver, proceeding at an excessive rate of speed, failed to heed warning signals on approaching a curve in the road, and where the driver was acquainted with the locality in which he was driving, and where, under these conditions, on approaching a curve, he failed to reduce his speed and, proceeding around such curve, overturned his car or collided with objects resulting in injury to the guest —it is held that whether the driver was guilty of gross negligence was for the jury. Sorrell v. White, 103 Vt. 277, 153 A. 359; Welch v. Auseth, 156 Wash. 652, 287 P. 899; Zelinsky v. Howe, 163 Wash. 277, 1 P. (2d) 294; Taylor v. Cockrell, 116 Cal. App. 596, 3 P. (2d) 16; note 86 A.L.R. 1145."

The New Hampshire court in *MacGowan v. Mills,* 93 NH 84, 35 A2d 797, 798, holds as follows:

"The jury could properly find on all the evidence that the defendant was driving at a high

rate of speed and that he was exceedingly heedless of the situation, although he knew of the existence of the curve and understood the danger involved in approaching it at the speed at which it could be found he was driving. These facts would fully justify a finding of gross negligence as that term is defined by the Massachusetts decisions."

In *Brown v. Hill,* 228 SC 34, 88 SE2d 838, 841, the Supreme Court of South Carolina holds as follows (In South Carolina heedless and reckless disregard of the rights of others must be proved in a guest case.) :

"The conflicting testimony to which we have referred, together with the physical facts testified to by Corporal Dubose without contradiction, was amply sufficient to carry to the jury the issue of whether the unfortunate accident was brought about by appellant's recklessness in approaching a dangerous curve without taking proper care, or in not having her car under control, or in operating it at a speed excessive in the circumstances."

The Supreme Court of Texas in *Bernal v. Seitt,* 313 SW2d 520, 522, in a late case states the following:

"Conceding that, in the ordinary case, the view taken by the court below would be well taken, we yet consider that, on the instant record, the findings of gross negligence are sustained by the evidence under the authority of Burt v. Lochausen, 151 Tex. 289, 249 S.W. 2d 194, and Kirkpatrick v. Neal, Tex. Civ. App., 153 S.W. 2d 519, wr. of error refused, want of merit. Indeed, we regard the instant facts as stronger for gross negligence than those of Burt v. Lochausen, in that here we have several circumstances, absent there, which positively point toward conscious indifference to the safety of others, that is to say, persistence, after repeated warnings, in excessive speed over a known difficult

road and further such persistence at a marked curve after dark with the consequent increase of danger from the light of the oncoming truck."

Other cases touching upon the matter under consideration are *Kimberly v. Reed,* 79 Ga App 137, 53 SE2d 208; *Zelinsky v. Howe,* 163 Wash 277, 1 P2d 294; *Alexiou v. Nockas,* 171 Wash 369, 17 P2d 911; *Sorrell v. White,* 103 Vt 277, 153 A 359.

In *Rauch v. Stecklein,* 142 Or 286, 20 P2d 387, this court, speaking through Mr. Justice ROSSMAN, reviewed four cases concerning which the court stated:

"It will be observed that in the four cases just reviewed the injury was inflicted under circumstances which made the tortious act hardly an inadvertent one."

One of the four cases referred to was the Iowa case of *Cerny v. Secor,* 211 Iowa 1232, 234 NW 193, concerning which this court stated as follows:

"* * * In *Cerny v. Secor* the host elected to drive ahead at a high rate of speed, disregarding a police warning sign which cautioned him of the curve ahead which his high speed rendered it impossible for him to round." *Rauch v. Stecklein,* supra, at page 293.

In his dissenting opinion in *Ross v. Hayes,* supra, at p 241, Mr. Chief Justice BELT said:

"In considering whether the circuit court erred in submitting this cause to the jury, there are certain fundamental legal principles which should ever be kept in mind. This court should not substitute its judgment for that of the jury on a question of fact. The evidence must be viewed in the light most favorable to the plaintiff. After verdict, the plaintiff is entitled to every reasonable intendment of the evidence. When reasonable minds might

differ as to whether the defendant Hayes was guilty of gross negligence, under all the facts and circumstances of the case—viewed in the light most favorable to plaintiff—the question is one of fact for the jury to determine. These principles are so well settled that citation of authorities in support thereof is deemed unnecessary."

Because in the opinion of the writer the opinions which result in a reversal of this cause are not in harmony with the fundamental principles announced by the late Chief Justice BELT, and because the writer is of the opinion that they are invasive of the province of the constitutional triers of fact, he is compelled to respectfully dissent.

**ON REHEARING**

Respondent's Petition for Rehearing

*Philip A. Levin,* Portland, argued the cause for appellant on rehearing. With him on the brief were Jack, Goodwin & Santos, Oregon City.

*George L. Hibbard,* Oregon City, argued the cause for respondent on rehearing. On the brief were Beattie, Hibbard, Jacobs & Caldwell and Harold Uney, Oregon City.

Before McAllister, Chief Justice, and Rossman, Warner, Perry, Sloan, O'Connell and Millard, Justices.

ROSSMAN, J.

The brief accompanying the petition for a rehearing and the argument presented on rehearing have been given careful consideration. In fact, the entire case has been analyzed once more.

Our original opinion gives a review of all parts of the evidence that appear to have any bearing upon the issues submitted by the appeal. The petition for a rehearing makes no claim that our review was unfair or incomplete. It argues that we should have affirmed the action of the trial judge which submitted

the case to the jury and that we should not have reversed the challenged judgment.

Only four witnesses testified. All of them were called by the plaintiff. Only two of them had seen the accident occur. They were the plaintiff and the defendant. Both of them swore that they could not recall anything whatever about the movement of the car immediately preceding its entry into the curve or what occurred from that point on. For example, neither the plaintiff nor the defendant could remember whether any occupant screamed before the car met with its mishap or whether it skidded. The other two witnesses were (1) a police officer who came upon the scene a few minutes after the accident had taken place and (2) Donald Graves, the friend of the plaintiff who was driving the car which was a quarter mile ahead of the defendant's and which was proceeding in the same direction. He did not see the accident take place.

Our original opinion states: "The plaintiff testified that before the car reached the turn he noticed that its speed was 65 miles." We so stated notwithstanding the fact that the plaintiff had sworn in one part of his testimony that he made his estimate of the defendant's speed before the car had reached Blackman's corner where, it will be recalled, it stopped for several minutes. Nevertheless, we shall continue to assume that the car's speed as it neared the turn was 65 miles.

There is nothing whatever in the record which indicates that the four young occupants of the car were in a gay or carefree frame of mind. The record mentions no petting, romping, singing or other activity which would draw the defendant's attention from her duty as driver. Her driving should be judged in the

same manner as that of any other person who is giving attention to the operation of the car.

The plaintiff testified that while the defendant was driving neither he nor any other occupant of the car commented upon the defendant's speed. His exact words were:

"Q  Did anyone in your car make any comment to Janet about the speed of the car?
"A  No.

"Q  Did you say anything to her about the speed?
"A  No.

\*     \*     \*

"Q  But you have no recollection of making any comment to her about speed?
"A  No.

"Q  Did any of the others make any comment to her about speed?
"A  Not to my knowledge."

If the defendant engaged in conversation while driving, or in any other way diverted her attention from her duty, the fact escaped mention. It is true that the plaintiff testified, "It seems like I said something that there was a curve, but she knew it was there." When his counsel asked him another question the plaintiff replied: "I said something about—I remember it was something about 'be careful of the curve' or 'watch out for the curve.'" Then he was asked, "Do you remember where it was when you made that comment?" He replied, "No, I don't." Upon cross examination he testified, "but it just comes to my memory that I said something about the curve coming up ahead. But I can't remember what happened after that." The plaintiff at no time undertook to mention anything that happened from the time the car neared the

curve. The plaintiff was not asked whether the defendant reduced her speed when she entered the curve.

Accordingly, as the car neared the curve the plaintiff "said something about the curve" but he was unable to "remember what happened after that." How far the beginning of the curve was from the scene of the accident is not disclosed by the record.

Possibly everyone who has driven a car with a guest in the front seat has heard his guest mention a curve in the road, an intersecting road, a highway sign, some other car that is in sight or something else that engages the attention. Comment of that kind is inevitable because guest and driver have their eyes on the road and the objects in sight. Surely, when the guest makes comment of that kind he is not giving a warning, especially not when, as the plaintiff said in this case, "but she knew it was there," that is, the curve.

The foregoing brings us to the curve. We pause to observe that although we have used the words "curve" and "turn" more than once in this opinion it may be that the turn in the road has received more attention in this court than it did in the trial court. For example, the above mentioned police officer, as a witness for the plaintiff and at the request of his counsel, drew in the presence of the jury upon a large sheet of drawing paper a sketch of the scene of the accident. It depicts the road, the shoulders, the telephone pole with which defendant's car collided, the skid marks made by the defendant's tires and sets forth in terms of feet the distance from the beginning of the tire marks to the pole and from the latter to where the car came to rest. But, it does not indicate the turn nor the distance from where the tire marks

began to where the turn ended.   After the officer had completed his drawing plaintiff's counsel addressed him as follows: "Will you put in where the curve is." The officer replied, "The curve is on up this way. The skid marks were not in the curve."   He was not asked for the distance from the curve to the beginning of the skid marks.

Neither he nor anyone else made any effort whatever to show the distance from the end of the turn to where the car seemingly escaped from the defendant's control.   The facts just mentioned possibly indicate that the turn was not deemed as important in the trial court as upon appeal.   We mention that fact solely for the purpose of indicating that it is impossible to determine from the record how far the car had traveled after leaving the curve before it escaped from the defendant's control.

Up to the point where the car approached the curve we have the plaintiff's account of its operation, but from that point on we do not have the benefit of anyone's description of what took place.   Both the plaintiff and defendant swore they could not recall what happened after the car approached the turn in the road.   It must be remembered that the accident did not happen in the area covered by the plaintiff's description but at some distance beyond that point. The record does not disclose the distance between the beginning of the turn and the spot where the car seemingly escaped from the defendant's control.   It is true that the evidence affords a depiction of the destruction wrought by the car after it left the pavement, and since the damage inflicted by the car may afford some basis for judging its momentum, we will later give that fact attention.

■ Our original opinion mentioned ·the fact that near the beginning of the curve a highway sign signified that the indicated speed at that place was 45 miles per hour. Mr. Justice O'CONNELL, in the specially concurring opinion which accompanied our original opinion, stated:

> "It is common knowledge that curves are frequently negotiated safely at speeds which exceed the indicated speed posted by the Highway Department."

We believe that Justice O'CONNELL's observation is well founded. If it needs corroboration it can readily find it in the fact that the Graves car which was just ahead of the defendant's was going at approximately the same rate of speed as the defendant's and passed through the curve and the area beyond without difficulty.

Although the plaintiff, as a witness, mentioned the curve and the sign which announced the indicated speed of 45 miles per hour, he did not say that the defendant failed to reduce her speed. It may be that a presumption is warranted (ORS 41.360 (1) and (33)) that the defendant reduced her speed to comply with the law's demands, but we will continue to do as we did in our original opinion and assume that the defendant drove through the turn of the road at about 65 miles per hour. In his specially concurring opinion Mr. Justice O'CONNELL stated:

> "We are entitled to recognize that rounding a curve at a speed twenty miles in excess of the indicated speed of 45 miles per hour does not, in itself, show that there is involved a high probability of serious harm."

■ It is clear, as our original opinion states, that the damage which the defendant's car inflicted indi-

cates that it was traveling with considerable momentum when the accident occurred. We are aware of no means whereby its actual rate of speed can be determined by looking at the two photographs of the wrecked car that constitutes part of the record and taking note of the other evidence. But we are satisfied that its speed must have been considerable.

*Navarra v. Jones,* 178 Or 683, 169 P2d 584, states:

"The defendant gave no testimony concerning the speed at which he was driving. There was, of course, evidence concerning the nature of plaintiff's injuries, which the plaintiff contended was some evidence of the violence of the collision with the concrete culvert, and, therefore, some evidence of the speed of the car. But such evidence alone was insufficient to show negligence, much less gross negligence, in the matter of speed. * * *"

Likewise, the fact that the accident happened does not establish the plaintiff's charges. *Simpson v. Hillman,* 163 Or 357, 97 P2d 527, holds:

"Res ipsa loquitur has no application. Hence, no presumption of negligence is created by the mere happening of the accident. * * *"

The following is taken from 61 CJS, Motor Vehicles, § 511 (3), page 204:

"The doctrine of res ipsa loquitur has been held not to be available to establish a presumption or inference of recklessness, gross negligence, willful misconduct, or gross negligence or willful and wanton misconduct."

The plaintiff was the last witness who testified. The following is taken from the close of his testimony:

"Q Gary, you had ridden with her before, hadn't you?

"A I think so, a couple of times.

"Q As far as you knew she was a careful driver?

"A Yes, as far as I knew. We drove around a couple of blocks in town there.

"Q There wasn't anything wrong with her driving as far as you were concerned on this particular evening except that you thought she was going a little too fast?

"A Yes, that was all. Maybe a little too fast.

"Q Nothing wrong with the car, nothing wrong with the weather or the surface of the highway or—

"A Not to my knowledge.

"Q — or the way she handled the car other than you thought she was going too fast?

"A That is right."

The testimony just quoted epitomizes the plaintiff's entire case. As our previous opinion points out, the pavement was unusually broad (20 feet). The photographs of it indicate that its surface was possibly anti-skid. Its center line was clearly marked with a stripe. The record mentions no intersecting roads. Both the defendant and the plaintiff (who was in the front seat) were familiar with the road. The night was clear. The shoulders adjacent to the pavement were 4 feet broad. The roadway was dry and there was no car in sight except the one a quarter mile ahead driven by the aforementioned Graves and going in the same direction. The plaintiff stresses the importance of the curve. However, as we have said, the evidence does not indicate the degree of curvature nor does it reveal whether the pavement was banked so as to facilitate the operation of a car through the curve. The photographs which we have mentioned appear to show a curve that is quite gentle. The following observation made by Mr. Justice O'Connell in his specially concurring opinion remains true:

"We are entitled to recognize that rounding a

curve at a speed twenty miles in excess of the indicated speed of 45 miles per hour does not, in itself, show that there is involved a high probability of serious harm."

*Williamson v. McKenna*, 223 Or 366, 354 P2d 56, contains a category of the circumstances in which a non-paying guest may recover a judgment against his host. One of the categories, as given in that opinion, is the following: "The defendant's conduct must involve a high degree of probability that harm will result." The opinion explains:

"* * * The probability that harm will result from conduct is but another way of saying that the conduct is dangerous. Conduct is not reckless unless the probability that harm will result is strong. * * * The conduct 'must involve an easily perceptible danger of substantial bodily harm or death and the chance that it will so result must be great.' 2 Restatement, Torts, § 500 comment a. * * *"

Obviously something happened about the time that the car left the curve which confronted the defendant with a condition that she could not solve in the available time. When events move faster than the mental ability of the driver an accident may take place. Possibly, if the defendant could have thought faster or if she had had greater experience as a driver the unfortunate accident would have been avoided.

We believe that the passages which we just quoted from the Williamson case are applicable to this one. We are satisfied that the evidence does not bring this case within the category above quoted from the Williamson decision.

We adhere to our previous opinion.

McALLISTER, C.J., and PERRY and MILLARD, JJ., concur in this opinion.

O'CONNELL, J., specially concurring.

Justice SLOAN's dissenting opinion contains two suggestions which require judicial comment. Beginning with the hypothesis that our guest statute is "unworkable," it is suggested that we either judicially repeal the statute or leave its interpretation entirely to the jury. Neither of these alternatives is consistent with our responsibilities as an appellate court.

Unquestionably, it is proper for us, in fact it is our duty, to repudiate outmoded principles of law announced and applied in our previous cases. But we have neither the duty nor the right to repudiate a statute merely because we do not believe that its application would carry out a wise policy. The function of declaring the policy of this state through law is shared by the legislature and the courts. It is within the power of the legislature to limit the automobile guest's right of recovery to cases in which the host-driver is guilty of misconduct of an aggravated type, and it may do so for reasons which do not appeal to us.

Perhaps the dissent means to say only that the legislature has such power but that through change the legislative reason has disappeared and the statute has, therefore, lost its legislative sanction. But we have no ground for assuming that the legislature regards the guest statute as outmoded. Considering the great volume of litigation under the statute it would, indeed, be a strange assumption.

If we can so readily dispose of an existing statute by indulging in the speculation that the legislative purpose has been abandoned, then many of our statutes

are susceptible to the same treatment. The constitutional separation of the functions of the judiciary and the legislature does not contemplate such judicial egoism.

Justice SLOAN then suggests that if the guest statute is permitted to live we should leave to the jury the function of determining whether particular conduct is within the statute. As I understand the suggestion, we would no longer review the guest cases to determine whether there was sufficient evidence to establish gross negligence. For reasons which need not be recited here, I believe that it would be unwise to abdicate our supervision of the jury in this area. If we accept Justice SLOAN's view that we should give up our control over the jury in the determination of the sufficiency of evidence of aggravated fault in the guest cases, there would be as much reason for refusing to review the jury's determination where the guest statute is not involved and the only question is whether the defendant was guilty of ordinary negligence. It is as difficult to draw the line between negligence and the absence thereof as it is to draw the line between negligence and reckless conduct.

The reference to Justice Holmes' view is misleading. Justice Holmes believed that the question of negligence should be determined by the court and not by the jury. That was simply his belief in a *theory* of the respective functions of judge and jury. Knowing that the law was to the contrary, he did not, as a judge, insist upon taking over the function of the jury in negligence cases. The dissent would make it appear that in *Williamson v. McKenna, supra,* we adopted Holmes' view. That is not so. In that case we recognized the proper function of the jury and

we also recognized the duty of the court to pass on the sufficiency of evidence warranting the submission to the jury of the question of the driver's aggravated fault. It is impossible to perform that duty unless a division is made between ordinary and aggravated fault. In that case an attempt was made to formulate a useable basis for making the division. I believe that the solution adopted in the Williamson case is preferable to the judicial repeal of the guest statute or the abdication of a part of our function of review in the guest cases, the alternatives suggested by Justice SLOAN. In fact, I do not believe that we would meet our judicial responsibilities if we were to adopt either alternative.

PERRY, J., concurs in this opinion.

SLOAN, J., dissenting.

For reasons not material, I did not participate in the case of *Williamson v. McKenna,* decided June 22, 1960, 223 Or 366, 354 P2d 56, so I could not express my basic difference with that opinion. In the instant case the majority now apply the *Williamson* opinion. Since I disagree with the result reached in this case, as well as the opinion in the *Williamson* case, I take this opportunity to express my reasons therefor. In this opinion when I refer to the "majority" it will be in reference to the *Williamson* opinion unless otherwise specified.

The opinion filed by Justice O'CONNELL reflects the exhaustive research and effort with which the opinion was written. I have no desire to criticize the result of that fine scholarship. Rather, my difference is in the judicial philosophy to be applied to the singular problems presented by the guest cases. I would not attempt to re-define gross negligence, etc.

Instead, I want to direct attention to the idea that the statute is now so unworkable that we should consider overruling *Perozzi v. Ganiere,* 1935, 149 Or 330, 40 P2d 1009. If that cannot be judically accomplished, then I believe the guest cases in particular are best left to the jury. It requires only brief exposition to discuss my philosophy in regard to "judge and jury" so I will turn to it first.

The difference I have with the majority on the function of the jury has been earlier expressed by others far wiser than I. It can best be illustrated by drawing the readers' attention to a small part of the comments found at 2 Harper and James, Torts, pp 971-972, on the function of the court in negligence cases. Irrelevant footnotes have been omitted.

> "* * * there has been a substantial school of thought in tort law which favors the progressive working out of detailed minimum and maximum standards of conduct as situations continue to recur and become crystallized. This is to be done by the court out of judicial notions of what is proper.[2] The chief exponent of this position was Mr. Justice Homes [sic].[3] The argument for it is that the

"[2] 'A judge who has long sat at *nisi prius* ought gradually to acquire a fund of experience which enables him to represent the common sense of the community in ordinary instances far better than an average jury. He should be able to lead and to instruct them in detail, even where he thinks it desirable on the whole to take their opinion. Furthermore, the sphere in which he is able to rule without taking their opinion at all should be continually growing.' Holmes, The Common Law 124 (1881).

"[3] See, e.g., Holmes, The Common Law 110 et seq. (1881). A different point of view was expressed by Judge Cooley in Detroit & M.R.R. v. Van Steinberg, 17 Mich. 99, 120, 121 (1868): 'The case, however, must be a very clear one which would justify the court in taking upon itself this responsibility. For when the judge decides that a want of due care is not shown, he necessarily fixes in his own mind the standard of ordinary prudence, and measuring the plaintiff's conduct by that, turns him out of court upon his opinion of what a reasonably prudent man ought to have done under the circumstances. He thus makes his own opinion of what would be generally regarded as prudence a definite rule of law. It is quite possible that if the same question of prudence were submitted to a jury collected from the different occupations of society, and perhaps better competent to judge of the common opinion, he might find them differing with him as to the ordinary standard of proper care. The next judge trying a similar case may also be of a different opinion, and, because the case is not clear, hold that

greater experience and acumen of the judge give him a sounder basis than a jury has for determining what should be done and, further, that if men are told in advance just what they may and may not do, the inhibiting fear of uncertainty will be removed as a stumbling block in the way of desirable affirmative activity. Moreover, moral fault is clearer when there has been disobedience to a definite instruction than where a man has been told simply to use his judgment at peril that some jury will later agree that he did so wisely. It is apparent that these reasons are bound up with the fault principle and the desire to refine it, and with notions of expediency associated with *laizzez faire*. But, as we have seen, the setting of specific standards tends by and large to restrict accident liability and, therefore, to work against the compensation of accident victims. It is small wonder, then, that Holmes' view has never become widely accepted by the courts and has lost ground in recent years.

Gauged by the rapid expansion, almost explosion, of the automobile negligence law since Cooley and Holmes were on stage, the diverse philosophies they expressed are almost of ancient origin. The divergence of view is, however, as fully alive today. Further exploration into the vast literature upon this subject would waste the time of both the writer and the reader. Reference to 2 Harper and James, at p 889 et seq. provides analysis of and citation to some of the comprehensive works on the subject.

The majority now choose to follow the arrow erected by Holmes. History indicates that when the courts adopt more particularized standards, the more limited

to be a question of fact which the first has ruled to be one of law. Indeed, I think the cases are not so numerous as has been sometimes supposed in which a judge could feel at liberty to take the question of the plaintiff's negligence away from the jury. . . . The difficulty in these cases of negligent injuries is, that it very seldom happens that injuries are repeated under the same circumstances; and, therefore, no common standard of conduct by prudent men becomes fixed or known.' "

has been the function of the jury. I fear that time will reveal that, despite the consecrated exertions of Justice O'Connell to devise a template with which to test the facts in a guest case, this court will continue to weigh the facts as a jury. New words have been applied to the situation but the result will be the same. I can best express my disagreement by saying I am of the firm opinion that the philosophy of Justice Cooley will more often provide essential justice.

This is particularly true when we recognize, as the majority acknowledge, that trial courts have formulated instructions in the guest cases which have left little doubt in most jurors' minds as to the burden a plaintiff must sustain. And the trial judge has not only heard the evidence, but has observed the witnesses—an advantage we elsewhere consider. Accordingly, it should be an exceptional case indeed when this court will review the finding of both the trial judge and the jury.

My second objection to the *Williamson* opinion requires more detailed explanation. When the court undertook to again define the language of the statute we should have gone to the very root of the problem it has created. Most of the 27 state courts (see Note, 34 Ind L J 338, n 2, 1957) saddled with a guest statute of some form have conceded an inability to conform to the requirements of the respective acts. It requires no seer to know that the application of the statutes has resulted in manifest injustice. Neither does it require exposition, beyond mention, to describe the revolution in motor vehicle travel between the period of 1927-1935, the years in which most of the guest statutes were enacted, and 1960. This revolution has

not been so subtle as to proscribe judicial notice thereof. Yet the majority appear to believe that we should continue to look at the act in the 1929 setting in which it was enacted. I think we should decide, if we can, the purpose for which the statute was enacted and any mischief it was designed to prevent and test the statute in that light. With respect to this postulate I am aware that the courts and jurists, both historically and presently, adopt widely divergent opinions as to both the power of a court and the extent to which a court may review a legislative act. See Read and MacDonald, Cases and other Materials on Legislation, ch 7, (1948).

In this instance, however, it seems not only fair but essential to ask: Of all the many relationships and activities created by motor vehicle travel, why should the legislature single out to penalize a person who commits no other act than to enter the motor vehicle of another? Was the status of host so salutary as to be protected and that of the invitee so opprobrious as to warrant restrictions of basic legal rights?

I think we cannot avoid some answers to these questions. The self-imposed rules of statutory construction do not prevent it. *Peters et al v. McKay et al,* 1952, 195 Or 412, 438 et seq., 238 P2d 225, 246 P2d 585. It also appears that when the legislature acts to limit powers normally exercised by the judiciary, and to deprive citizens of existing rights, the courts have not only the power, but the duty to examine the act with greater care.[1] This should be particularly true when it can be shown that the purpose and result of the guest act was to deprive one class of citizens of existing common law rights for the economic benefit of another class.

---

[1] 1 Cooley's Constitutional Limitations, ch V, (8th Ed, 1926).

What prompted the enactment of the guest statute in this as well as other states?

"The history of the 'guest law movement' is quite vague, but it seems probable that sometime prior to 1927 there arose several cases in which a generous driver, having offered a ride to a friend or a stranger along the highway, suddenly found himself a defendant in a case that turned on some clear question of simple negligence.

"No doubt there were also cases where there was collusion between the host and the guest in order to fasten liability upon the insurance company by which the car was insured.

"It seems quite probable that some executive of a large insurance company looked over the list of 'cases paid' at the end of a year. Probably he either was a member of the bar or had been trained in the law. When he observed the large number of cases in which the claimant or plaintiff had been a guest in the car, he conceived the idea of a statute that would rule out 'simple negligence' in all such cases and thus reduce the risk of his company. He wrote to an insurance commission or the commissioners of several states. The idea grew. In 1927, Connecticut enacted the first guest law.  *  *  *
"*  *  *  *  *

"*  *  *  During the depression after 1929, there were many hitch-hikers and many actions were filed by guests picked up on the highways. All insurance company officials became interested in the enactment of guest statutes, and primarily through their efforts guest law bills were introduced in almost every state.  *  *  *"@

The United States Supreme Court found itself not "unaware of the increasing frequency of litigation in

---

@ 1954 Ins L J 583, a paper given by Clel Georgetta, an attorney of Reno, Nevada, at the Fourteenth Annual Convention of the Federation of Insurance Counsel. I do not know to what extent the writer has drawn upon his imagination. The source lends some credence to Mr. Georgetta's theory of the conception and birth of the guest statutes. It might also be assumed that the executive's knowledge of the law would make him aware of Massaletti v. Fitzroy, 1917, 228 Mass 487, 118 NE 168. By 1935 about 28 states had adopted guest statutes.

which passengers carried gratuitously in automobiles, often casual guests or licensees, have sought recovery of large sums for injuries alleged to have been due to negligent operation." The court found that the legislature (of Connecticut) could consider that these cases presented an "evil" to be regulated. *Silver v. Silver,* 1929, 280 US 117, 122, 50 S Ct 57, 74 L Ed 221, 65 ALR 939. It has been said that: "Thus, the aim of the statutes and the courts is to protect honest guest claimants on the one hand, to prevent thievery on the part of fraudulent claimants on the other, and to bring down the cost of carrying automobile liability insurance protection."[⑧] Our own court apparently considered that fear of collusive actions and a distaste for "biting the hand that feeds" were reasons which prompted our guest statute. *Perozzi v. Ganiere, supra.*

It should be fair to assume that our legislature was prompted by the motive just described when it passed the guest act. The fact that the legislatures of most of the states were presented with guest statutes within a relatively contemporaneous period of time indicates that a well organized group was sponsoring such legislation. It does seem unlikely that a national epidemic of anti-guestitis was visited upon the several members of the state legislatures by natural causes. Therefore, if the reasons above given for passing the guest statute be true, then it presents a real cause for the difficulty the courts have faced in trying to apply them.

In other words, if the evil to have been eliminated was fraud, it is readily apparent that restricting liability does not cure the vice. The prevention of fraud was a proper public policy. And it should not

---

[⑧] Malcom, Automobile Guest Law, 1937, p 3.

be inferred by what I say here that there was anything improper in the design of the companies to protect themselves from fraud. The trouble is that the cure adopted did not fit the disease. To apply a more stringent test of liability for all hosts and guests had no reasonable relationship to fraud. It would be much like prescribing castor oil for a broken bone. The act treats all persons who ride in another's motor vehicle as *mala per se*. The result is that a court gets no help if it attempts to look to any purpose or policy to be served in construing the act. Obviously, the court cannot give an instruction that the guest act will apply only when the parties have been guilty of conniving. The courts have been required, therefore, to try and later discard numberless definitions and standards by which to apply the guest acts. In final analysis each definition has been a use of the same words in different context or order or different words having largely synonymous meanings. Each such attempt and failure by a court has been caused, in large part, by the fiction that a so-called guest in an automobile should be penalized, but the reason therefor had no relationship to the status of the actors involved. If the "aim" of the guest statutes was to distinguish between the honest and dishonest guest, it is difficult to see how that purpose has been accomplished. It would be difficult to find any similar statutory scheme where the righteous are punished equally with the sinner. It would be equally difficult to find a similar situation in which the legislative action has no direct relationship to the purpose of the statute and the evils to be eliminated.

The problem of applying such words as "gross negligence", "wilful and wanton" to solve this dilemma has been described, in a somewhat facetious vein, by

an Illinois lawyer, David M. Burrell, in writing a handbook for Illinois trial lawyers on the subject of "A New Approach to the Problem of Wilful and Wanton Misconduct." [4]

> "One experienced trial judge has evolved a theory which epitomizes the hopelessness of our traditional technique. It may be called the 'Oh, my God' theory of wilful and wanton misconduct. The application of this theory is simple: If, while listening to a witness recount the facts of the accident, the judge finds himself gripping the arms of his chair and saying to himself, 'Oh, my God, you didn't' then the conduct is wilful and wanton. Quite clearly, this view has the virtue of candor and the disadvantage of hopelessness for, as to the latter, no prediction can be based upon it and the best argument for the defense would be to slip the judge a sedative. On the other hand, it is impossible to read the welter of words that ornament the traditional opinions on this subject without concluding that, consciously or unconsciously, they merely serve to obscure the judicial process, whatever that may be."

I am convinced that much of the confusion resulting from the guest statute stems from our inability to consider the real purpose intended to be served by the statute. This is one of the reasons why we should consider nullifying the act.

On the other hand, if we consider that the purpose of the act was to preclude a person from "biting the hand that feeds" him, then we should more closely examine the status of the person riding in another's car to make sure that the rider is being fed by the host. And that test should be more realistically applied to the facts of today's motor vehicle use.

In short, it is probable that in 1929 many of the

---

[4] *1949 Ins L J*, 717, at p 723.

persons who entered the vehicle of another were more likely to be a true gratuitous invited guest. Today, however, we all know that the freeways, the highways providing approach to the more metropolitan areas, and city streets are clogged at given hours of each day with workmen sharing the ride, mothers pooling cars to haul children to school and places of recreation—no small part of the traffic problem—teen-age youngsters sharing rides to school and recreation, business associates sharing rides to mutual engagements for the equal convenience of all in the car, judges and lawyers sharing rides to bar meetings. Today the cost, greater distances involved from place of residence to place of work and traffic congestion, to name only a few of the causes, compel citizens in all walks of life to a combined use of automobiles as an accepted part of neighborhood, business, and particularly, suburban, life. We cannot ignore these facts.

Further, as exemplified by the instant case, the growing use of automobiles by children of high school age is, of course, now widespread. A rarity in 1929. Yet when a group of high school children enter a car, as in this case, the purpose is usually one of greater benefit or pleasure to the host than to the guest. If the issue had been raised in this case I doubt that it could be said that plaintiff was a guest in the car in any actual legal or factual sense of the word.

I recognize that the matter of defining a guest was not in issue in the *Williamson* case nor in the instant case. However, I think that we must face the fact that people in the use of automobiles have themselves altered the status of many vehicle passengers beyond the concept of a guest in the more strictly legal sense of the word. It would seem to me that we would defy

reality if we continue to require some form of tangible consideration to distinguish between a guest and a passenger.⑤ I am of the opinion that people would be more confused with an explanation of the legal concept of an automobile guest than they would be with definitions of gross negligence, etc. We should recognize that the automobile has become as much of an essential tool in the requirements of today's business and social life as a tractor is to a farmer. An automobile can no longer be treated as land and all that enter therein are trespassers and do so at their peril. "But moral associations which are wholly of artificial creation, when intellectual culture goes on, yield by degrees to the dissolving force of analysis   *   *   *." ⑥

The basic issue that I come to is: If the guest act has become, as it appears to be, unworkable and incapable of sensible application, we should say so.⑦ We should not wait for a harried legislature to relieve the courts of the state of an intolerable burden that results in more injustice than justice. I recognize as fully as my brethren that such action by a court must be taken only when the reasons therefor are conclusive. "But the dilemma between an interpretation that leaves

---

⑤ "* * * If we search the precedents so intent upon the past that we have no eye for what is going on in the world about us, it is easy to find analogies and resemblances which will serve as a superficial justification for the extension of a precedent to sets of facts whose social implications may be quite different from any which the precedents have considered * * *" Harland F. Stone, The Common Law in the United States, 1936, 50 Harv L R 4, p 9.

"* * * Law performs its function adequately only when it is suited to the way of life of a people. * * *" ibid., p.11.

⑥ From a treatise by John Stuart Mill, reprinted in part in Weber, The Western Tradition, 1959, pp 542, 552.

⑦ "* * * No doubt there is a field within which judicial judgment moves untrammeled by fixed principles. Obscurity of statute or of precedent or of customs or of morals, or collision between some or all of them, may leave the law unsettled, and cast a duty upon the courts to declare it retrospectively in the exercise of a power frankly legislative in function. * * *" Cardozo, The Nature of the Judicial Process, 1921, p 128.

policy to the legislature, and obedience to the dead hand of an outmoded provision remains." [8]

"Is it too much to hope that courts, who must often take over this function from the jury in order to give proper weight to the social utility of conduct which undoubtedly threatens harm to the legally protected interests of others, will realize that, in so doing, they are exercising an administrative function and that such decisions are not, like their decisions construing and declaring those principles which are fundamental to our concept of law, sacrosanct from judicial re-examination and change under changing conditions?" [9]

In *West v. Jaloff,* 1925, 113 Or 184, 232 P 642, 36 ALR 1391, Chief Justice McBRIDE had this to say about a somewhat similar statute:

"* * * This construction takes away from an injured person a good common-law remedy for a private injury committed by a private citizen and gives him an emasculated remedy wholly inadequate under many conditions. Perhaps, if the section should be construed as referring to the criminal liability of the driver, it might be upheld. But ever since the cases of [citing cases] it has been the settled law of this state that the common-law remedy for negligently inflicted injuries could not be taken away without providing some other efficient remedy in its place. * * *"

It is my view that we should examine the guest statute to see if by today's and tomorrow's standards the statute any longer provides an "efficient remedy" for the common law rights it abolished. And if it is found that this court cannot now overrule *Perozzi v. Ganiere, supra,* then we should more consistently leave the determination of these cases to the jury.

---

[8] Friedmann, Legal Theory (3rd Ed) p 304.
[9] Bohlen, Mixed Questions of Law and Fact, 1924, 72 Penn L R, pp 111-122.

In respect to the instant case the majority have now applied one of the tests adopted by *Williamson v. McKenna, supra.* The opinion on rehearing in this case says: "One of the categories, as given in that opinion, [*Williamson*] is the following: 'The defendant's conduct must involve a high degree of probability that harm will result.'" The opinion concludes that the defendant's conduct did not encompass a high degree of the probability of harm. Neither the original opinion nor the one on rehearing indicate upon what basis this conclusion is reached; by what judgment or intuition the court decides what creates a high probability of harm.

The unexpressed assumption seems to be that the risk of running off of the road while rounding a curve at high speed is less likely to produce serious injury than some other form of negligent driving—pulling out of a line of traffic to pass another car, for example. Facts are available, if we are going to consider facts, which dispute the majority's concept of safety. Statistics as to the causes of accidents involving fatalities have been gathered by the state motor vehicle department for several years. Statistics for the year 1959 reveal some interesting, if not striking, comparisons as to the relative harm that may result from given kinds of highway accidents. Assuming that the incidence of death is a fair criteria of risk of harm, we find that, in 1959, 117 deaths occurred in accidents classified as "Ran off road." This compares with 68 deaths resulting from "head-on" collisions. It appears that 192 deaths resulted from one-car accidents compared with 143 resulting from collision accidents. Statistics gathered by the National Safety Council for the same year reveal that 40 per cent of total highway deaths resulted from "collision

of motor vehicles" and an equal 40 per cent resulted from "noncollision, roadway." Deaths resulting only from "car off curve" caused 16 per cent of total highway deaths in comparison to 20 per cent caused by "head-on or sideswipe."

These compilations may not be conclusive, but they are more persuasive than someone's estimate as to what form of negligent driving results in the more serious harm. It is apparent that driving around a curve with excess speed is one of the most frequent causes of death. It creates a belief that the conduct of the defendant in the instant case did create a "high degree of probability" that harm would result.

If I had participated in the original consideration of this case I would have joined in the dissent of HARRIS, J. I do join in the present dissent of WARNER, J. The judgment should be affirmed.

WARNER, J., dissenting.

I did not sit when this matter was first heard by the court in January of this year. Had I done so, I would have then joined in the carefully considered dissenting opinion of HARRIS, J. pro tem., *Burghardt v. Watson*, 223 Or 155, 349 P2d 792, 804, and which has lost none of its original force by reason of the rehearing.

My prime objection to the last majority opinion, as well as to the first, is a feeling that the result reached is attained by the majority in failing to apply certain long established and universally recognized rules, particularly those applying when the appeal is from a denial of a motion for directed verdict, as here.

On the issue of gross negligence we are not permitted to weigh the evidence, but are limited to re-

viewing it solely for the purpose of determining whether there was substantial evidence of gross negligence or reckless disregard. *Johnston v. Leach,* 197 Or 430, 433, 253 P2d 642 (1953).

In *Fish v. Southern Pacific Co.,* 173 Or 294, 301, 143 P2d 917, 145 P2d 991 (1944), we said:

> "Error is assigned upon the court's rulings on the motions for directed verdict and for judgment notwithstanding the verdict. In considering the propriety of these rulings, the motions must be regarded as having admitted the truth of plaintiff's evidence, and of every inference of fact that may be drawn from the evidence. The evidence itself must be interpreted in the light most favorable to plaintiff. *McCall v. Inter Harbor Nav. Co.,* 154 Or. 252, 59 P. (2d) 697. Where the evidence conflicts, the court may not infringe upon the function of the jury by seeking to weigh or evaluate it, but is concerned only with the question of whether or not there was substantial evidence to carry the case to the jury and to support the verdict. *Ellenberger v. Fremont Land Co.,* 165 Or. 375, 107 P. (2d) 837; *Allister v. Knaupp,* 168 Or. 630, 126 P. (2d) 317."

See, also, *Eilertsen v. Weber,* 198 Or 1, 5, 255 P2d 150 (1953); *Stout v. Madden & Williams,* 208 Or 294, 298, 300 P2d 461 (1956).

At this point I address myself solely to the matter of evidence of defendant's speed as she closely approached the curve and the testimony of plaintiff concerning his apprehension and warnings given to defendant, all of which stand uncontradicted.

This review of that part of the record is prompted by the majority statement, reading: "The plaintiff testified that while the defendant was driving neither he nor any other occupant of the car commented upon

the defendant's speed." The statement is correct if it is intended to impart the idea that no one in the car made reference to the speed in terms of its rate as traveling a given number of miles per hour. But, if that statement is intended to convey the impression that plaintiff was not uneasy and possibly indifferent to the rate defendant was traveling and sat silent, then I urge such a conclusion is clearly erroneous. This is made evident when we restore to its proper context the quotation from plaintiff's testimony relied upon by the majority in support of their quoted conclusion. This I now do:

"Q Now, as you came down the road towards— before you got to this curve, Gary, did you ever have occasion to look at the speedometer on the car?

"A [Gary Burghardt] Yes. I looked at the speedometer.

"Q And from where you were sitting would you tell the jury—first, I will ask you where was it when you first looked at it or was it all the way down the road?

"A What?

"Q Was it all the way down the road from Blackman's Corner that you had been glancing at the speedometer?

"A Just off and on. Once in awhile I happened to see that it was over towards the right.

"Q Over toward the right. Is that the kind of speedometer that moves in a straight line across?

"A I couldn't say.

"Q But at least it was over to the right?

"A That's the way it looked to me.

"Q Do you remember where the last time was when you noticed the speedometer? Where were

you with reference to this curve the last time you noticed the speedometer?

"A We hadn't come to it yet when I noticed the speedometer.

"Q Would you tell the jury your estimate of how fast you were going then?

"A I would say at least 65.

"Q At least 65. Did anyone in your car make any comment to Janet about the speed of the car?

"A No.

"Q Did you say anything to her about the speed?

"A No.

"Q *Did you think that she was going fast or not?*

"A *Yes.* I thought she was but I didn't say anything because I just didn't want—I don't know, maybe she wanted to go fast and I wasn't the driver and I didn't think I should say anything.

"Q Did you have any conversation about anything as you came up to this curve? Do you remember anything that you were talking about?

"A Not particularly.

"Q Did anyone, you or anyone, make any comment to her about the curve coming up?

"A Just that she knew there was a curve coming up, I think, and we didn't say anything that would have any reason for her to be excited or make her just tromp on the brake or something like that.

"Q Did anyone make any comment to her about the curve that was coming up, say anything to her about it?

"A It seems like I said something that there was a curve, but she knew it was there.

"Q What do you remember that you said?

"A *I said something about—I remember it was something about 'be careful of the curve,' or 'watch out for the curve.'*

"Q Or watch out for the curve?

"A Or *watch out for the curve; yes.*

"Q Do you remember where it was when you made that comment?

"A No, I don't.

"Q But you have no recollection of making any comment to her about speed?

"A No.

"Q Did any of the others make any comment to her about speed?

"A Not to my knowledge." (Emphasis supplied.)

After Gary had testified at a juncture in the cross-examination that it came to memory "that I said something about the curve coming up ahead," he was asked:

"Q Are you sure you did, or is that just vague?

"A That's what I remember because I was kind of nervous about it."

I respectfully submit that majority evaluation of so limited a portion of plaintiff's testimony exemplifies a too particularized but unconscious judicial encroachment upon the prerogatives of the jury and a too far departure from the long established rules previously referred to.

The foregoing extracts from the testimony of plaintiff, in my opinion, not only warrant inferences on the part of the jury that defendant's car within the mile approaching the curve was traveling "at least 65" miles per hour as it neared the curve; and that plaintiff was apprehensive about the speed and warned defendant to be careful but that she, notwithstanding her previous personal knowledge of the signs advising 45 miles as the proper rate, heedlessly continued her

course of risk and danger without abating the speed she was then traveling.

In reference to the curve the majority opinion states: "* * * but from this point on [the curve] we do not have the benefit of any one's description of what took place." This, I respectfully submit, is not an exact statement. It ignores what value the jury might properly attach to the testimony of the witness Graves as to the speed of defendant's automobile before, while in the curve, and up to the moment of the unfortunate accident.

We learn from the record that somewhere near Blackman's corner and before driving the mile intervening between that point and the curve, the occupants of the Olson car hailed another nearby automobile driven by Donald Graves and with a passenger, both apparently friends of Gary. It came to a stop, whereupon Gary momentarily left defendant's car and went over to the Graves' car where he had a conversation with the occupants of that automobile and returned shortly to take his place in defendant's automobile. Upon leaving, the Graves car went first and was followed by defendant, and, as she testifies, at Gary's request. The reason for this arrangement is not revealed nor is it of any importance to our understanding.

However, it is evident from the testimony of Graves, which follows, that he and his passenger were from thence forward interested in the progress of defendant's car which was behind them about "a quarter of a mile."

"Q After leaving Blackman's Corner did you notice their car behind you?

"A [Don Graves] Yes. We noticed the car.

"Q Now, about how far ahead of them were you, Don, when the accident happened?

"A Oh, I would judge a quarter of a mile. Somewheres in there.

"Q Could you see their headlights in your rearview mirror?

"A Yeah.

"Q Now, can you tell the jury whether or not she appeared to be gaining on you or just about holding steady or what?

"A Well, I couldn't say for sure but I was doing about 55, maybe 60, and she was keeping up with me. She might have been gaining. I couldn't say.

"Q You were about a quarter of a mile ahead?

"A Yes.

"Q Could you have been going a little faster than that?

"A 55, 60, is what I was going.

"Q That's what you think?

"A Yes.

"Q What did you notice, if anything, in your rearview mirror at the time the accident happened?

"A I didn't notice anything but the boy with me said he noticed—

"MR. GOODWIN: I object to that.

"THE COURT: Yes. You musn't tell what somebody else said.

"Q (By Mr. Jacobs) At least you understood that an accident happened?

"A Yes.

"Q What did you do?

"A We turned around and went back."

From this testimony the jury was entitled to infer that the occupants of the Graves' car were following closely and with continuing interest, whether by aid

of the medium of the rearview mirror or otherwise, the progress of defendant's automobile from its departure at Blackman's corner, through the curve and to the point where it left the highway and were close enough to it to notice the happening of the accident, whereupon, the Graves' car "turned around and went back." The observation of defendant's car on the part of Graves and his companion was for the relatively short time elapsing between the departure of the two cars from Blackman's corner and the occurrence of the mishap, for in terms of speed miles could only have been but a few minutes if plaintiff's car was traveling at the speed testified to by plaintiff and Graves. The jury was justified in concluding from Graves' testimony that plaintiff traveled the entire course, including the distance while on the curve, at a speed of "about 55, maybe 60" miles per hour and possibly faster.

Both of the majority opinions following the first and last hearings seem to question the speed that defendant's car was traveling, the sharpness of the curve, and whether or not defendant was on the curve when her car left the highway.

I note in the last majority opinion that the car "was traveling with considerable momentum" and "that its speed must have been considerable." The photographs (Exhibits 3 and 4), copies of which are annexed to the opinion of Judge HARRIS in his dissent to the first majority opinion, portray the beginning and end of the curve. He then says from these photographs it is submitted the jury could find that "the curve was a sharp one." I concur in that conclusion. That it is not an illogical observation and was equally knowledgeable to the jury is conceded by the defendant, who in her brief says: "The accident occurred

just beyond a *sharp curve* which is shown in Exhibits 3 and 4." (Emphasis supplied.)

As to the question whether the car was on the curve when it left the highway, it is submitted that a jury might well have found that the car's point of departure was at a place in the curve area by examination of Exhibit 3 which graphically notes the location of the telephone pole that defendant's car broke in two and from thence noticed that 113 feet east therefrom, as shown by the State Policeman's graphic drawing (Exhibit 1), was a point where the car started to skid on the curve.

In his specially concurring opinion, Mr. Justice O'CONNELL observes:

> "There is no difficulty in finding that defendant was conscious of a risk when she approached the curve. From her previous use of the particular highway she knew that the curve was there, its character and the speed indicated by the highway sign as the safe speed to negotiate the curve. * * *" *Burghardt v. Watson,* supra (349 P2d 803)

To this I would add that in addition to her own knowledge of the curve and personal consciousness of the risk, was the equal personal knowledge of plaintiff who made his apprehensions articulate by warning words born of his concern because of the speed she was then traveling.

The foregoing quotation from the opinion of Mr. Justice O'CONNELL is immediately followed by the statement:

> "* * * The ingredient which is lacking is the *high degree of probability* that serious harm would result. It is common knowledge that curves are frequently negotiated safely at speeds which

exceed the indicated speed posted by the highway department. We are entitled to recognize that rounding a curve at a speed twenty miles in excess of the indicated speed of 45 miles per hour does not, in itself, show that there is involved a high probability of serious harm. * * *"

My point of departure from the reasoning of Justice O'CONNELL is embodied in his statement as to the want of the ingredient of a *"high degree of probability* that serious harm would result." It is undoubtedly true that certain drivers of experience with cars of certain kinds and sizes might at times successfully negotiate the curve without hazard at speeds equal to or greater than that traveled by the defendant on that occasion. But that knowledge of the success of others cannot and should not be invoked as a mitigating factor or standard to be applied in all cases where such warning signs are ignored. Each case, in this respect, should be evaluated in the light of the circumstances existent in that case. I contend that the jury, not the court, should make that evaluation.

What is the purpose and meaning of warning signs established near the approaches of curves if not to convey to automobile drivers that they will assume a high degree of probable serious harm to themselves and others if they travel at any greater than the indicated speed on the portion of the highway so marked or flagged? Wherein is the value unless designed as an avoidance to reckless driving and its potential dangers?

Is not the court rendering the legally placed warning signs innocuous as an effective means of thwarting highway disasters and minimizing the obligation of all drivers to avoid injury to their passengers and others by adopting with approval the conclusion of

Justice O'Connell that the possibility of successfully rounding a curve at speeds greater than indicated by the warnings signs does not in itself show that there is involved a high probability of harm? Does not the majority's failure in this matter to accord to such signs their fullest possible significance as devices to commanding observation of their intended warning run afoul of Mr. Justice Brand's statement in *Turner, Adm'r v. McCready et al.,* 190 Or 28, 54, 222 P2d 1010 (1950), where he says: "The element of recklessness may, under some circumstances, be inferred from evidence of the driver's conduct in the light of conditions and of what he must have known."

Here, the teenage driver's conduct was an imprudent willingness to risk harm to her passengers by unsuccessfully betting, so to speak, her judgment that she could safely travel the curve at a speed 20 miles greater against the considered judgment of state authority, as reflected by its sign warning that such speed involved a high degree of probable risk of danger. Moreover, the visual warning of the state in the case at bar was amplified by the cautionary words of plaintiff.

I would not usurp the functions of the jury, but I cannot avoid the observation that there was enough material evidence to justify the jury's inference that defendant's conduct involved easily perceptible dangers of substantial bodily harm or death to the passengers in her automobile and that her operation of her car would so result if she proceeded around the curve at the speed the jury was warranted in finding she was traveling, and which gave her conduct a foolhardy or "don't care" attitude and hence the color and quality of gross negligence.

I do not mean to suggest that any one of the fore-

going elements, i.e., speed, warnings of plaintiff, and highways signs, defendant's familiarity with the road and curve, and possible diverting conversations, etc., taken separately, would justify a finding of gross negligence; but I do represent that taken in combination they presented a jury question as to whether the defendant was grossly and indifferently negligent under all the circumstances. *Turner, Adm'r v. McCready et al.,* supra (190 Or at 54); *Burrows v. Nash,* 199 Or 114, 123, 259 P2d 107 (1953).

I am apprehensive that the evaluation of the evidence by the majority tends to dilute much of the force and value of Mr. Justice O'CONNELL's able opinion in *Williamson v. McKenna,* decided June 22, 1960, 223 Or 366, 354 P2d 56, to which I subscribed, and indicates that we are again in danger of unduly trespassing upon the province reserved to the jury in gross negligence cases.

I would confirm the judgment of the circuit court.

Mr. Justice SLOAN joins in this dissent.